KENNEDY, Circuit Judge.
 

 Architectural Glass & Metal Co., Inc. (AGM) petitions this Court to review a decision and order of the National Labor Relations Board (Board or NLRB) finding that it committed unfair labor practices by interrogating and refusing to hire a paid union organizer, in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (a)(3). AGM contends that the Board erred (1) in rejecting its primary defense to the unfair labor practice charges; (2) in failing to hold that the paid union organizer’s admitted falsification on his job application precluded the Board from ordering AGM to offer the organizer employment and to make him whole for lost wages; and (3) in finding that the paid union organizer was a bona fide job applicant. The Board cross-appeals for enforcement of its order. For the following reasons, we GRANT the petition for review and DENY the Board’s cross-application for enforcement.
 

 I. Facts
 

 AGM, a non-union employer, is engaged in the business of installing metal and glass components for the construction of buildings. Its principal place of business is Indianapolis, Indiana. At the time of the alleged unfair labor practices, the company had three principals: Greg Menefee, company president; Tim Nelson, vice president and secretary; and Robert Peel, vice president and financial officer. Menefee was responsible for hiring job applicants.
 

 On August 1, 1993, Harry Zell became a full-time paid field representative for Local 1165, Glaziers, Architectural Metal & Glass Workers Union, AFL-CIO (Union). His salary was $600 per week plus expenses. Additionally, Zell received full medical insurance and pension coverage. As a field representative, Zell’s primary responsibilities were to organize the employees at non-union businesses and deal with prevailing wage issues. Zell was authorized by the Union to apply for and accept employment at non-union employers. If he did go to work for a non-union employer, Zell would continue to receive his full union salary and benefits. The Board found that Zell would perform his union duties during his off hours if he began working simultaneously for another employer.
 

 On August 3, 1993, Zell went to AGM to apply for a job in response to an advertisement that the company had placed in the local newspaper seeking applicants for employment. While at AGM’s office, Zell completed a job application form, leaving blank the space on the form where the applicant was asked to identify his current employer. He did not state anywhere on the form that he was an employee of the Union. Zell certified by his signature on the application that the facts contained in the application were true and complete. The application explained that “falsified statements on this application shall be grounds for dismissal.”
 

 After Zell completed the application, Peel and Nelson interviewed him, because Mene-fee was on vacation. Although the subject of the Union did not come up during the interview, Peel and Nelson could tell from the application that Zell had worked for union contractors in the past. Zell’s application also revealed that he had participated in the Union’s apprenticeship program. Peel and Nelson told Zell that they would get back to him. Sometime that day, after Zell left
 
 *-1155
 
 AGM’s offices, Peel and Nelson decided that they would offer Zell a job as a “helper.”
 

 The following day, Peel called Zell and left him a message. Zell called back and, unbeknownst to Peel, tape recorded the telephone conversation. During the conversation, Peel offered Zell an $8-an-hour job as a helper to start the following Monday. The following exchange then occurred:
 

 ZELL: Uhm, there’s one thing I have to ask you about.
 

 PEEL: Okay.
 

 ZELL: Um, is it a problem with you guys, being, for, me being in the union. I mean I know ... Is that a problem.
 

 PEEL: You’re in the union now?
 

 ZELL: Yes.
 

 Peel thought that Zell’s statement was “rather strange,” especially because Zell laughed as he said it. Peel put Zell on hold and went to ask Nelson’s advice. Peel and Nelson decided that they should discuss the matter with Menefee before proceeding. They got back on the telephone with Zell and told him that they were going to have to consider the issue, and that they would get back to him.
 

 Peel and Nelson later spoke with Menefee and described to him the telephone conversation with Zell. Menefee subsequently contacted Mark Officer, President of Pre-Fab Companies, Inc., who told Menefee that Zell was a field representative for the Union.
 

 Menefee then called Zell. Zell, returned the call on August 28, 1993. This conversation was not recorded, and Menefee and Zell recounted different versions of its contents. Zell claims that Menefee asked him whether he was in the Union and whether he was going to stay in the Union. Menefee maintains that he asked Zell whether he was an
 
 employee
 
 of the Union and whether he intended to continue working for the Union if he came to work at AGM. According to both versions, after Zell responded affirmatively, Menefee then said that AGM would not hire him.
 

 On January 3, 1994, the Union filed charges with the NLRB alleging that AGM had violated sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. § 158(a)(1), (a)(3). The focus of these charges was the telephone conversation between Menefee and Zell, during which the NLRB claimed that Menefee unlawfully interrogated and refused to hire Zell. AGM admitted that it questioned and refused to hire Zell, but it denied that its conduct was unlawful, because (1) it had applied its non-diseriminatory rule prohibiting the hire of individuals who hold and will continue to hold a full-time job elsewhere, (2) Zell falsified his job application, and (3) Zell was not an “employee” within the meaning of the Act.
 

 The Administrative Law Judge (ALJ) held a hearing on September 27, 1994. On November 18, 1993, the ALJ issued a decision finding that AGM had violated the Act as charged. The ALJ first found that it is unlawful to refuse to hire a full-time paid union organizer because of that status. He therefore concluded that under either Zell or Menefee’s version of the second, unrecorded telephone conversation, AGM had engaged in unlawful interrogation in violation of section 8(a)(1) of the Act.
 

 With regard to the refusal to hire allegation, the ALJ found that both Zell and Mene-fee were credible. Therefore, because the Board had the burden of proof, he credited Menefee’s version of the conversation. The ALJ then found that it was “clear from the record that Menefee refused to hire or withdrew the offer of employment ... because Zell was a full-time paid union field representative who would, if hired, try to organize [AGM’s] employees.”
 

 The ALJ then rejected AGM’s defenses. First, it found that although Zell was “less than candid” when he omitted his union position from the job application, AGM had only discovered this ground for dismissal after it had refused to hire Zell. Second, adhering to Board precedent,
 
 see, e.g., Sunland Construction Co., Inc.,
 
 309 N.L.R.B. 1224, 1992 WL 390105 (1992), the ALJ found that Zell was a bona fide applicant for employment even though he was a paid union organizer.
 
 [1]
 
 
 *-1154
 
 Finally, the ALJ found no merit to AGM’s claim that it did not hire Zell because he was a full-time employee elsewhere, because Me-nefee never asked Zell whether the union job would interfere with a job at AGM. The ALJ further noted:
 

 [M]any working women, especially those with younger children, quite reasonably look on their mothering responsibilities as a full time or close to it job that they do in addition to their ‘outside the home’ jobs. What about employees who spend large amounts of time participating in coaching, scouting, or other voluntary efforts. Should they lose protection under the Act because they serve two masters?
 

 The ALJ thus concluded that AGM violated sections 8(a)(1) and 8(a)(3) of the Act when it refused to hire Zell.
 

 AGM filed exceptions to the ALJ’s proposed order. The Board subsequently affirmed with minor modification the ALJ’s findings and conclusions and adopted the proposed order. The Board thus ordered AGM (1) to cease and desist from the unfair labor practices it was found to have committed; (2) to offer Zell the position of helper or its substantial equivalent; and (3) to make Zell whole for any loss of pay. On March 23, 1995, AGM petitioned for review of the Board’s order. On May 1, 1995, the Board filed a cross-application for enforcement of its order. Because AGM does business in the State of Ohio, this Circuit has jurisdiction pursuant to 29 U.S.C. § 160(e) and (f).
 

 II. Discussion
 

 A. Standard of Review
 

 The standard of review when the Board finds a violation of sections 8(a)(1) and 8(a)(3) is well established. This court upholds the Board’s findings of fact if “they are supported by substantial evidence on the record viewed as a whole.”
 
 NLRB v. Pentre Elec., Inc..,
 
 998 F.2d 363, 368 (6th Cir.1993);
 
 see also
 
 29 U.S.C. § 160(e), (f);
 
 Universal Camera Corp. v. NLRB,
 
 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). We also review the Board’s application of the law to the facts under the substantial evidence standard.
 
 See Pentre Elec.,
 
 998 F.2d at 368;
 
 NLRB v. Aquatech, Inc.,
 
 926 F.2d 538, 544 (6th Cir.1991). However, we review the Board’s conclusions of law
 
 de novo. See NLRB v. Fluor Daniel, Inc.,
 
 102 F.3d 818, 826 (6th Cir.1996). “If the Board errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no (reasonable basis in law.’ ”
 
 Pentre Elec.,
 
 998 F.2d at 368.
 

 B. AGM’s Policy Regarding Applicants for Employment Who Hold Another Full-Time Job
 

 AGM argues that Zell was not hired because it has a nondiseriminatory policy prohibiting the employment of those who simultaneously hold another full-time job. AGM therefore asserts that it did not violate the Act because it has demonstrated a legitimate reason for asking Zell about his union employment and for not hiring him. Because our analysis of the merits of this defense with regard to the refusal to hire allegation affects our view of the defense with regard to the unlawful interrogation allegation, we will begin with the refusal to hire allegation.
 

 1. Refusal to Hire
 

 Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to engage in conduct intended to interfere with, restrain, and coerce employees in exercising their rights under section 7 of the Act.
 
 [2]
 

 See
 
 29 U.S.C. § 158(a)(1). Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against employees with regard to terms or tenure of employment for the purpose of discouraging membership in a labor organization.
 
 See
 
 29 U.S.C. § 158(a)(3). “Although sections 8(a)(1) and (a)(3) are not coterminous, a violation of section 8(a)(3) constitutes a derivative violation of section 8(a)(1).”
 
 Metropolitan Edison Co. v. NLRB,
 
 460 U.S. 693, 698 n. 4, 103 S.Ct. 1467, 1471 n. 4, 75 L.Ed.2d 387
 
 *-1153
 
 (1983). The General Counsel of the NLRB bears the burden of proof in unfair labor practices cases.
 
 See Fluor Daniel,
 
 102 F.3d at 831.
 

 In
 
 NLRB v. Transportation Management Corp.,
 
 462 U.S. 393, 397-98, 401-03, 103 S.Ct. 2469, 2472-73, 2474-75, 76 L.Ed.2d 667 (1983), the Supreme Court approved the Board’s approach, established in
 
 Wright Line,
 
 251 N.L.R.B. 1083, 1980 WL 12312 (1980), to analyzing cases “involving charges of employment actions motivated by anti-union animus and employer protestations of legitimate reasons for the actions.”
 
 W.F. Bolin Co. v. NLRB,
 
 70 F.3d 863, 870 (6th Cir.1995) (quoting
 
 Birch Run Welding & Fabricating Inc. v. NLRB,
 
 761 F.2d 1175, 1179 (6th Cir.1985)). First, the General Counsel must establish by a preponderance of the evidence a prima facie case that anti-union animus motivated or contributed, at least in part, to an employment action.
 
 See Transportation Management,
 
 462 U.S. at 400, 103 S.Ct. at 2473-74;
 
 W.F. Bolin Co., 70
 
 F.3d at 870;
 
 NLRB v. Cook Family Foods, Ltd.,
 
 47 F.3d 809, 816 (6th Cir.1995). If this prima facie case is established, then the employer can avoid being held in violation of sections 8(a)(1) and 8(a)(3) if it proves, also by a preponderance of the evidence, that the employment action “rested on the employee’s unprotected conduct as well and that the employee would have lost his job in any event.”
 
 Transportation Management,
 
 462 U.S. at 400, 103 S.Ct. at 2473;
 
 accord Cook Family Foods,
 
 47 F.3d at 816. This latter showing is regarded as an affirmative defense, and if the proffered business justification is deemed pretextual, the defense fails.
 
 See W.F. Bolin Co.,
 
 70 F.3d at 873;
 
 NLRB v. Vemco, Inc.,
 
 989 F.2d 1468, 1482 (6th Cir.),
 
 amended by
 
 997 F.2d 1149 (6th Cir.1993).
 

 Drawing upon
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), this Circuit recently held that in a refusal to hire case in which an established employer seeks applicants for newly created jobs, the General Counsel’s prima facie case consists of proving:
 

 (1) that the employer is covered by the Act; (2) that the applicant is covered by the Act; (3) that the applicant actually applied for a job and was qualified for a job for which the employer is seeking applicants; (4) despite his qualifications the applicant was not hired; (5) anti-union animus contributed to the decision not to hire an applicant; and (6) after his rejection, the position remained open and the employer continued to seek applications from persons with the applicant’s qualifications.
 

 Fluor Daniel,
 
 102 F.3d at 832. In defending this newly-articulated prima facie test against claims that it conflicts with
 
 Wright Line,
 
 we noted that we had no desire to disturb
 
 Wright Line’s
 
 test for discriminatory animus where it is applicable. “We simply believe it is inapplicable in cases involving hiring rather than discharge or discrimination in other terms or conditions of employment against those already holding a position.”
 
 See id.
 
 at 833. Our reliance on
 
 McDonnell Douglas
 
 makes clear, however, that after the General Counsel has established a prima facie ease of union-based discrimination, the burden shifts to the employer to articulate some legitimate, nondis-eriminatory reason for the employer’s rejection of the applicant.
 
 See McDonnell Douglas,
 
 411 U.S. at 802, 93 S.Ct. at 1824. The prima facie case simply serves to eliminate the most common nondiscriminatory reasons for the rejection of a job applicant.
 
 See Texas Dep’t of Community Affairs v. Burdine,
 
 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
 

 Thus, under either
 
 Fluor Daniel
 
 or
 
 Wright Line,
 
 an employer can assert a legitimate nondiscriminatory reason for refusing to hire a particular applicant. Although refusing to hire a paid union organizer
 
 solely
 
 because of that status would be unlawful,
 
 see Transportation Management Corp.,
 
 462 U.S. at 398, 103 S.Ct. at 2472-73, the employer arguéd here that the paid union organizer was not hired because of its policy against hiring individuals who intend to work simultaneously for another employer on a full-time basis. However, the Board improperly relied on the ALJ’s assessment of the legitimacy of AGM’s dual employment policy and, in the process, it suggested that such a policy cannot rebut an unfair labor practice
 
 *-1152
 
 claim. Although the Board suggested that it believed that AGM’s proffered business justification was pretextual — “[AGM] claims that it would not hire a full-time employee who had a full-time job elsewhere, but Menefee never asked if Zell's union job would interfere with his job with [AGM]” — it was really questioning the legitimacy of such a rule. In other words, in adopting the ALJ’s findings, the Board appears to have found that an employer cannot assert that such a dual employment policy was the basis of its employment action because such a rule is not legitimate. The Board’s determination as to what qualifies as a defense against an unfair labor practice charge is a question of law,
 
 see E & L Transport Co. v. NLRB,
 
 85 F.3d 1258, 1265 (7th Cir.1996), subject to
 
 de novo
 
 review,
 
 see Fluor Daniel,
 
 102 F.3d at 826. We conclude that the Board’s decision in this respect was based on legal errors.
 

 While paid union organizers are “employees” within the meaning of section 2(3) of the Act, 29 U.S.C. § 152(3),
 
 see NLRB v. Town & Country Elec., Inc.,
 
 — U.S. —, —, 116 S.Ct. 450, 457, 133 L.Ed.2d 371 (1995), that does not mean that an employer’s refusal to hire a paid union organizer is always unlawful under section 8(a)(3).
 
 [3]
 
 Rather, as in all cases involving charges of employment actions motivated by antiunion animus, the employer should be permitted to attempt to demonstrate that it had a legitimate business reason for taking employment action against a paid union organizer. Indeed, just because an employee is a paid union organizer does not mean that an employer can take no adverse actions against that employee.
 
 [4]
 

 See Town & Country,
 
 — U.S. at—, 116 S.Ct. at 457 (“A company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker, file a complaint with the Board, or notify law enforcement authorities.”);
 
 Willmar Elec. Sen)., Inc. v. NLRB,
 
 968 F.2d 1327, 1330 (D.C.Cir.1992) (holding that paid union organizers are employees within the meaning of the Act, but noting that “we are ready to assume
 
 arguendo
 
 that Willmar made out so powerful a case of likely disloyalty that the Board would have had to conclude that rejection of Hendrix’s application
 
 on that ground
 
 would have been legitimate and not in violation of the anti-discrimination and anti-coercion provisions of the Act.”);
 
 cf. Phelps Dodge Corp. v. NLRB,
 
 313 U.S. 177, 186, 61 S.Ct. 845, 849, 85 L.Ed. 1271 (1941) (stating that the Act “does not impose an obligation on the employer to favor union members in hiring employees”).
 

 Additionally, a rule prohibiting an employee from working two full-time jobs is legitimate.
 
 See H.B. Zachry Co. v. NLRB,
 
 886 F.2d 70, 75 (4th Cir.1989).
 
 [5]
 
 An employer could reasonably conclude that the work product of an employee would suffer if that employee worked two full-time jobs. Additionally, an employer could require its employees to work overtime and on the weekends on a regular or irregular basis, and a second job would make it more difficult for an employee to comply with those require
 
 *-1151
 
 ments. Of course, such a rule must be applied in a nondiscriminatory fashion,
 
 see H.B. Zachry,
 
 886 F.2d at 75;
 
 cf. Airborne Freight Corp. v. NLRB,
 
 728 F.2d 357, 358 (6th' Cir. 1984);
 
 Burger King Corp. v. NLRB,
 
 725 F.2d 1053, 1055 (6th Cir.1984), and must be promulgated for nondiscriminatory reasons,
 
 see Tualatin Elec., Inc.,
 
 319 N.L.R.B. 1237, 1995 WL 788569 (1995) (finding that substantial evidence indicated that an anti-moonlighting policy was adopted as a result of employer’s anti-union animus). The Board could reasonably find that a rule has been diseriminatorily or laxly administered or that the timing of the rule’s promulgation indicates that employees are being targeted for union activities.
 
 See Aquatech,
 
 926 F.2d at 547. But this goes to whether the employer has asserted the rule as a pretext for union-based discrimination, not to whether the rule can be asserted as a defense in the first place.
 
 [6]
 

 The Board actually concedes in its brief that employers may promulgate and enforce nondiscriminatory hiring practices excluding dual full-time employment candidates from consideration. In fact, the Board’s decision in this case conflicts with prior Board statements. In
 
 Willmar Electric Service, Inc.,
 
 303 N.L.R.B. 245, 1991 WL 135226 (1991),
 
 enforced,
 
 968 F.2d 1327 (D.C.Cir.1992), the Board adhered to its holding that full-time paid union organizers are employees within the meaning of the Act and thus cannot be denied employment simply on the basis of that union activity or status. But it noted in a footnote that
 

 [a]n employer may, however, lawfully refuse to hire a statutorily protected employee applicant, including a paid union organizer, on the basis of a nondiscriminatory policy against hiring any individual who,
 
 for example, seeks only temporary employment, applies while working for another employer, or
 
 intends to work simultaneously for more than one employer.
 
 The Respondent here did not prove that it refused to hire ... pursuant to any such nondiscriminatory policy.
 

 303 N.L.R.B. at 246 n. 2 (emphasis added). In addition, in his concurring opinion in
 
 Sun-land Construction Co.,
 
 309 N.L.R.B. 1224, 1992 WL 390105 (1992), Member Rauda-baugh opined that an employer with a nondiscriminatory policy or practice of refusing to hire persons who will be simultaneously employed by another employer could lawfully refuse to hire a paid union organizer.
 

 While the General Counsel now agrees that such a policy is a valid defense, the Board found otherwise. Even if the Board’s decision can be construed as finding that AGM’s proffered justification was pretextual, it erred in suggesting that AGM’s policy was invalid as a matter of law. We cannot be certain the extent to which the Board’s view of this policy affected any finding that the policy was pretext.
 
 [7]
 
 Here, the Board erroneously suggested that an employer’s policy regarding the hiring of individuals who intend to work two full-time jobs simultaneously was legally invalid as a defense to an alleged refusal to hire. Thus', we conclude
 
 *-1150
 
 that the Board applied the wrong legal standard in analyzing this portion of the case.
 

 2. Unlawful Interrogation
 

 Our opinion regarding the validity of AGM’s policy affects our analysis of the unlawful interrogation allegation. “An employer violates section 8(a)(1) of the Act by coercively interrogating its employees about their union activities.”
 
 NLRB v. E.I. DuPont De Nemours,
 
 750 F.2d 524, 527 (6th Cir.1984). The basic test for evaluating the legality of an interrogation is “ ‘whether under all of the circumstances the interrogation reasonably tends to restrain, coeree or interfere with rights guaranteed by the Act.’”
 
 Dayton Typographic Serv. v. NLRB,
 
 778 F.2d 1188, 1194 (6th Cir.1985) (quoting
 
 Ross-more House,
 
 269 N.L.R.B. 1176 (1984),
 
 enforced,
 
 760 F.2d 1006 (9th Cir.1985)). Among the factors relevant in determining the coercive effect of employer interrogation are the background of employer hostility to unionization, “the nature of the information sought, the questioner’s identity, and the place and method of interrogation.”
 
 Id.
 
 An employer with a legitimate reason may question employees concerning union matters without violating section 8(a)(1).
 
 See Mead Corp. v. NLRB,
 
 697 F.2d 1013, 1025 (11th Cir.1983).
 

 With regard to the unlawful interrogation claim, the Board found it unnecessary to determine whose version of the telephone conversation was credible, because it found that as a matter of law “it is unlawful to refuse to hire a full-time paid union organizer because of that status.” Yet, the Board ultimately credited Menefee’s version of the conversation, which focused on Zell’s employment with, not his membership in, the Union. The Board did not consider whether AGM had a valid reason for asking Zell whether he would remain
 
 employed
 
 by the Union if he came to work for AGM. Because we hold that an employer may assert that it refused to hire a paid union organizer because of a legitimate nondiscriminatory policy regarding applicants who intend to work simultaneously elsewhere, it follows that an employer could ask an applicant whether he or she intends to work full-time for two employers. The nature of the information sought would be related to a legitimate policy of the employer.
 
 Id.
 
 Consequently, in the absence of other circumstances suggesting that the inquiry was coercive, the interrogation would be lawful. Because the Board concluded that AGM’s policy was invalid as a matter of law, it failed to properly consider its relevance to the unlawful interrogation claim, even though it credited Menefee’s version of the conversation with its emphasis on Zell’s employee status with the Union. Accordingly, the Board’s decision with regard to this allegation has no “reasonable basis in law.”
 
 See Pentre Elec'.,
 
 998 F.2d at 368.
 

 III. Conclusion
 

 Because we conclude that the Board applied the wrong legal standards in analyzing this ease, we DENY enforcement of the Board’s order.
 

 [1]
 

 . The Supreme Court has since held that paid union organizers are "employees” protected by the Act.
 
 See NLRB v. Town & Country Elec., Inc.,
 
 — U.S. —, —, 116 S.Ct. 450, 457, 133 L.Ed.2d 371 (1995).
 

 [2]
 

 . Section 7 of the Act gives employees the right to organize, form, join, or assist any union, to bargain collectively through representatives of their own choice, to act together for other mutual aid or protection, and to choose not to engage in any- of these protected concerted activities.
 
 See
 
 29 U.S.C. § 157.
 

 [3]
 

 . Indeed, the Supreme Court specifically noted in
 
 Town & Country
 
 that it did not "express any view about ... whether or not Town & Country's conduct (in refusing to interview, or to retain, 'employees' who were on the union's payroll) amounted to an unfair labor practice.” —U.S. at—, 116 S.Ct. at 457.
 

 [4]
 

 . The Supreme Court noted in
 
 Town & Country
 
 that its holding that paid union organizers are "employees” within the meaning of the Act did not mean that the law did not offer alternative remedies for an employer, short of excluding such employees from all protection under the Act.
 

 For example, a company disturbed by legal but undesirable activity, such as quitting without notice, can offer its employees fixed-term contracts, rather than hiring them "at will” as in the case before us; or it can negotiate with its workers for a notice period. A company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker, file a complaint with the Board, or notify law enforcement authorities.
 

 —U.S. at—, 116 S.Ct. at 457.
 

 [5]
 

 .In
 
 Town &
 
 Country,—U.S. at—, 116 S.Ct. at 457, the Supreme Court overruled the Fourth Circuit's primary holding that paid union organizers are not protected by the Act,
 
 see H.B. Zachry,
 
 886 F.2d at 75. However, the Fourth Circuit stated in dicta that a policy denying employment to persons concurrently employed elsewhere was valid.
 
 See
 
 886 F.2d at 75 (“[S]imulta-neous direction and supervision might tax the energies and concentration of an employee, impairing his productivity and compromising his value to the company.”).
 

 [6]
 

 .
 
 Fluor Daniel
 
 raises the question of what exactly an employer’s evidence of a dual employment policy establishes within the analytical framework developed in that case. Evidence of such a policy could be construed as establishing that an applicant was not "qualified” for a position or it could be construed as a legitimate nondiscriminatory reason proffered by the employer
 
 after
 
 the prima facie case has been established and an inference of discrimination exists. The Supreme Court has not explicitly addressed the question of what constitutes a "qualification” within the meaning of the
 
 McDonnell Douglas
 
 prima facie case. Indeed, one district court has noted that "the analysis of whether an employee is ‘qualified’ under the
 
 McDonnell Douglas
 
 test often folds into the analysis of whether the employer had a nondiscriminatoiy reason to discharge the employee or not hire the employee.”
 
 Hall v. Daka International, Inc.,
 
 949 F.Supp. 969 (N.D.N.Y.1996). We need not decide this issue here, because we conclude that the Board erred in suggesting that as a matter of law an employer could not assert such a policy, at any stage, as a justification for its actions.
 

 [7]
 

 . The Board’s General Counsel argues that the evidence of AGM’s policy was insubstantial and that Menefee’s testimony demonstrates that he refused to hire Zell because he feared that Zell would attempt to organize AGM’s employees. Counsel points to relevant evidence in the record, but the problem for us is that the Board did not address much of this evidence at all. We decline to search the record in order to make the necessary fact findings when the Board has not done so initially.
 
 See Fluor Daniel,
 
 102 F.3d at 836.