NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0199n.06
Filed: March 16, 2007

Nos. 05-1138; 05-1268; 05-1324, 05-2244, 05-2354

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DYNCORP, INC.,

      Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent/Cross-Petitioner.

ON PETITIONS FOR REVIEW AND CROSS-APPLICATION OF ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

---

AMERICAN POSTAL WORKERS UNION, AFL-CIO,

      Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent,

and

DYNCORP, INC.,

      Intervenor.

/

BEFORE:     NORRIS, COLE, and CLAY, Circuit Judges.

**CLAY, Circuit Judge.** This case involves five petitions to this Court. The National Labor Relations Board ("N.L.R.B." or "the Board") issued an opinion finding that DynCorp, Inc. ("DynCorp") violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) ("N.L.R.A." or "the Act") and ordering a new union election at the plant. The Board additionally found that DynCorp's dismissal of Grant Turner, an employee who headed the efforts to unionize the plant, was lawful. The AFL-CIO ("the union") brings a petition to review the Board's decision that Turner was terminated lawfully. DynCorp brings a petition to review the Board's decision that it committed a § 8(a)(1) violation. DynCorp additionally brings a separate petition to request review of the Board's order compelling DynCorp to bargain. Finally, the Board cross-petitions to compel DynCorp to comply with its order. For the reasons set forth below, we **AFFIRM** the findings of the Board with respect to the § 8(a)(1) violations and the termination of Turner and **ENFORCE** the Board's order in full; we **DENY** DynCorp's motion to review the Board's order.

## STATEMENT OF FACTS

**Factual History**

DynCorp was a government contractor charged with inspecting and repairing equipment for the United States Postal Service. In October of 1999, Turner along with Danny Hollon, both employees at DynCorp, began efforts to unionize the plant's employees. Turner began handing out flyers seeking "interested parties" for the union and posted one of these flyers on the DynCorp bulletin board in the cafeteria. This bulletin board was often used by employees to post personal notices and flyers. Such flyers typically remained on the board for several weeks and no disciplinary action was ever taken against any employee who used the bulletin board for personal matters. When

Duncan Dawkins, the plant manager, learned of the flyer Turner had posted, he removed it, informed Turner the bulletin boards were for company use only, and threatened disciplinary action if Turner posted non-business related materials again. After this incident, Dawkins placed a sign above the bulletin board stating "For DynCorp Business Use Only."

By early 2000, the union campaign was in full swing. Many employees distributed information on unionization and wore pro-union buttons. An election petition was filed on January 24, 2000, and the election was scheduled for March 8, 2000. Dawkins and the rest of the management team began wearing "Vote No" buttons. Many employees testified that in addition to the buttons, the management team made other efforts to campaign against the election of the union. Several employees testified that they were told by supervisors that benefits would be lost if they elected a union. Employees also testified that management warned them that some unions had put some companies out of business. Specifically, Turner testified that on February 15, 2000, he was told by Supervisor Wade Moore at a meeting with several other employees that if they elected the union they would "automatically lose" their stock ownership benefits (ESOP) to which the company currently contributed thirty cents per hour.

The container repair employees at the plant, a group which included both Turner and Hollon, were the most vocal supporters of the union. Several employees testified that once the campaign began, management changed the route that the container repair employees were allowed to take when going to the cafeteria for breaks and lunch. The new route made it impossible for the employees to talk to other units as they walked to the cafeteria. While it is undisputed that the route did change, DynCorp contends it was so that the walkways would not be impeded. One employee additionally

3

testified that the container repair employees had their break times changed so that they no longer took breaks with the processing employees. Supervisor Dale Lawrence testified that the different shifts always took breaks separately and supervisor Tracey Coulter confirmed that this had been true since she began working at DynCorp in 1999.

Throughout the campaign, many people at DynCorp wore "Vote Yes" and "Vote No" buttons to show their support for either side of the campaign. Some employees elected not to wear buttons, and some were rarely seen without theirs. Linda Reynolds, an employee who had chosen not to wear a button, testified that she was approached by Supervisor Tim Wolfe and offered a "Vote No" button. Reynolds declined to take the button because she "considered her position private." (J.A. at 5). Another employee, John Groves, testified that he was approached by Lawrence and offered a "Vote No" button, which Groves accepted. Lawrence told Groves, "I didn't think you were gonna take it." (J.A. at 6). Groves testified that he wore the button that day to avoid hurting Lawrence's feelings. Harold Godbey, a vocal union supporter who almost always wore a "Vote Yes" button was also approached by Lawrence. One day, when Godbey was not wearing his pro-union button, Lawrence inquired where Godbey's "ornament was." (J.A. at 6). Lawrence explained that he meant his pro-union button and Godbey responded that he did not wear it that day. Lawrence also asked Phil Henderson, another known union supporter, where his "medals of honor" were. (J.A. at 6). Lawrence clarified that he was referring to Henderson's pro-union button, which he usually wore. Lawrence then asked Henderson if he was on the union organizing committee and if he went to meetings. Henderson responded that he was on the committee and that he did attend their

meetings and Lawrence remarked that he was "disappointed" in Henderson's pro-union activity. (J.A. at 7).

The day after this conversation took place,[1] Henderson asked Moore for assistance completing his inspections for the day as he had done previously. Typically he requested such assistance on average about three days a week, and he had never been denied. This time Henderson was told by Moore that he would not receive help and when he inquired as to why, he was told to talk to Lawrence. Henderson asked to speak to Lawrence who confirmed that he would not receive the assistance he requested. When Henderson pressed Lawrence for a reason he was refusing to grant Henderson assistance, Lawrence told Henderson"because I can." (J.A. at 552). The next day when Henderson came to work, however, Moore asked him if he needed assistance and when Henderson said yes, he was given assistance as he had been given on all occasions prior to the previous day's incident.

On either March 6, 2000 or March 7, 2000, Dawkins spoke to a group of employees and urged them to vote against the union. Specifically, he said:

> Also ask yourself if you think that I now know the issues. You have done a great job of identifying areas that need to be changed. Example: Overtime, workflow issues, seniority issues, supervisory problems, policy issues. I am forbidden by law to tell you today that I am going to make changes. But I can assure you that I recognize that there are changes that need to be made. It would be foolish for me not to address these issues. In fact it would be quite probable that significant changes would be made long before a contract is ratified.

---

[1]There is some discrepancy as to when these two incidents took place in relation to each other, which is addressed later in the opinion.

(J.A. at 8). It is unclear when the speech took place. Several pro-union employees remember it being on March 7, 2000, which would have put it less than twenty-four hours before the election and, therefore, in *per se* violation of the N.L.R.A. Dawkins and several anti-union employees, however, remember it being on March 6, 2000.

On March 8, 2000, the election was held and the union lost the vote 94-114. Sometime after the election, Turner received a disciplinary notice for failure to wear safety glasses outside of his work area. Turner admitted that he had done so, but he testified that he attributed the disciplinary notice to lingering bitterness over the election. In October, Turner received two disciplinary citations for excessive absenteeism. When he complained to Dawkins that he had not been excessively absent, the citations were removed and Dawkins explained that they had been issued in error.

All employees at the plant were required to meet daily quotas of "100% efficiency." In an effort to encourage more efficiency, the company created the "120% club." When an employee reached 120% of his or her quota for the day, he or she received a restaurant gift certificate and a small celebration was held. According to several employees, in order to get as many people as possible performing at this level every day, supervisors encouraged workers to "buddy up" and share work product so that they sometimes took credit for work they did not do and gave credit for work they did do to their fellow employees. Wolfe was named by employees as one of several supervisors who actively encouraged this process. Coulter was also named as a supervisor who knew of the practice, though she denied ever hearing that employees were sharing work product.

During the fall of 2000, Turner's efficiency had dropped to about 76% efficiency, and he received a disciplinary notice for this. Turner complained that this was due to the fact that he was

6

not receiving enough work because the supervisors still resented him for his involvement in the union campaign. He circulated a letter to the other employees complaining of these unfair labor practices and informing them he planned to begin campaigning again to elect a union at DynCorp. Dawkins denied having any knowledge of this letter or of Turner's intentions to attempt again to organize.

Three employees, Rob Honnerlaw, Mitzi Gunn, and Delores Johnson, believed Turner was being denied enough work product to make his quota and thought this was unfair. They decided to share work product with him to help him reach his quota, and they began performing work and giving it to him so that he could take credit for its completion. Because of their efforts, his efficiency numbers jumped to 113% and 150% for November. Coulter noticed this substantial change and informed Dawkins. Dawkins began an investigation and spoke with Honnerlaw, Gunn, Johnson, and Turner. When asked, Honnerlaw, Gunn, and Johnson admitted they had been sharing work product with Turner. However, when Dawkins asked Turner about the sudden change in his productivity, he responded that he had simply made a mistake when he submitted his paperwork. Turner testified that he had lied in an attempt to protect his co-workers from getting in trouble for helping him. Dawkins asked all of the supervisors if any of them knew of the practice of employees sharing work and if any of them encourage such a practice and they responded that they did not. Turner was fired immediately and the other three employees who had participated were fired four days later.

Prior to this incident, no other employees had been fired for sharing work product. In 1999, an employee, Chad Williamson, had been suspended for three days for claiming credit for work that had not been completed at all. Dawkins explained that the decision to fire Turner, as opposed to

7

suspend him was justified because when Williamson was suspended it had not been proven that the error had been Williamson's fault. Dawkins further explained that Turner was terminated immediately, as opposed to the other employees involved, who were terminated four days later, because of Turner's dishonesty about the incident.

After the union lost the election, it filed objections to the election and filed Unfair Labor Practice ("ULP") charges against DynCorp. Turner additionally filed ULP charges against DynCorp because of his termination. The parties went before an administrative law judge ("ALJ"), who found numerous violations of the N.L.R.A., but ultimately concluded that none of them affected the outcome of the election. The case then came before the N.L.R.B. The Board concluded that, as the ALJ had held, DynCorp violated § 8(a)(1) by unlawfully interrogating employees, making impermissible threats against Henderson of more onerous working conditions, and discriminating against pro-union employees when determining who could use company bulletin boards. The Board disagreed with the ALJ and held that DynCorp also impermissibly threatened employees with the loss of their stock benefits and made impermissible promises of benefits if they voted to reject the union. The Board also concluded that Turner was not discharged because of his union activity in violation of the Act. The union filed objections to this order which have been consolidated and are now before this Court. Later, DynCorp received leave to intervene in that action.

The Board additionally found that DynCorp's violations affected the outcome of the election, and it set aside the results of the initial election and ordered a second one. On April 6, 2005, a second election was held. The union won by a vote of 65-54. On April 25, 2005, the union made a written request that DynCorp bargain with it. Since April 28, 2005, DynCorp has admittedly

8

refused to bargain because it alleges that the union was improperly certified because the Board erred in ordering a second election. The union brought the case to the Board to get an order to compel DynCorp to bargain. The Board declared that DynCorp was in violation of § 8(a)(5) and (a)(1) and that "all issues raised by DynCorp were or could have been litigated in the prior representation proceeding" and thus, DynCorp was barred from raising them for the first time at that stage. DynCorp brought a petition to review the Board's order and the Board filed a cross-petition for enforcement of its order. This case was consolidated with the others now before this Court.

**DISCUSSION**

**I.      There was substantial evidence to support the Board's finding that DynCorp violated § 8(a)(1) of the N.L.R.A. by its behavior leading up to the union election**

**A.      Standard of Review**

The N.L.R.B. findings of fact will be upheld "if supported by substantial evidence on the record." *Kamtech, Inc. v. NLRB*, 314 F.3d 800, 807 (6th Cir. 2002). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002). Additionally, "[w]e also review the Board's application of the law to particular facts under the substantial evidence standard." *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998) (internal quotation marks omitted). Thus, "where the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced." *Id.* This is a highly deferential standard. *See NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir. 2000).

We will review the record as a whole, but we will show deference both to the reasonable inferences drawn by the Board from the facts presented and to credibility determinations made by

the Board and will set aside the findings of the Board only when "the record demonstrates that the Board's decision is not 'justified by a fair estimate of the worth of the testimony of witnesses' or by the Board's 'informed judgment on matters within its special competence or both.'" *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999) (quoting *Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985)).

### B.      Analysis

The questionable actions in which DynCorp engaged can be classified into 3 groups: prohibiting the use of the bulletin board; alleged coercive threats and promises; and alleged coercive interrogations.

### 1.      Prohibiting Use of the Bulletin Board

We have in the past held that "[t]he right of self-organization includes the right to use the company bulletin board for union notices if the bulletin board has been used for other notices without any required advance authorization." *NLRB v. V & S Schuler Eng'g*, 309 F.3d 362, 368-69 (6th Cir. 2002). This well-settled tenet of law has found consistent support in this Circuit and in the decisions of the N.L.R.B. *See Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir. 1983). *See also Waste Mgmt., Inc.*, 330 N.L.R.B. 634 (2000) ("It has long been held that an employer violates the Act if it prohibits '[t]he posting of material relating to and in the course of concerted activity of its employees, while having previously allowed the posting of other miscellaneous matters by the employees.'" (quoting *Vincent's Steak House*, 216 N.L.R.B. 647 (1975))). *See also Benteler Indus.*, 323 N.L.R.B. 712 (1997); *Earon Techs.*, Inc., 322 N.L.R.B. 848 (1997); and *Central Vermont Hospital*, 288 N.L.R.B. 514 (1988).

We addressed a situation similar to the present case in *NLRB v. Challenge-Cook Bros., Inc.*, 374 F.2d 147, 152 (6th Cir. 1967). In that case, there was no formal policy with respect to what types of messages could be posted on the bulletin board. *Id*. at 152. One personnel manager testified that it was his understanding that no postings would be allowed if they were "controversial in nature," but he knew of no instances where postings had been removed. *Id*. at 152-53. However, once some employees began posting pro-union materials, the company began enforcing a previously unenforced screening policy and began taking down the pro-union materials. *Id*. This Court concluded that such selective enforcement constituted a violation of the N.L.R.A. Essentially, we held that where a restriction was being placed on pro-union materials that had not been previously placed on other materials, even where the restriction was already in existence, selectively enforcing such a restriction constituted a violation of the Act. *Id*. In other words, where a company permits use of a bulletin board by "policy *or practice*," such use cannot be prohibited for pro-union materials. *Union Carbide Corp.* 714 F.2d at 660 (emphasis added).

At DynCorp, there are several bulletin boards that are used by the management and employees, but the one at issue in this case is one in the cafeteria. According to the evidence on the record, employees frequently use this board for personal postings. DynCorp alleges that the company bulletin board is for business-related use only, and that all non-work related postings are removed when they were noticed. Even so, DynCorp concedes that even when these other postings were removed, no other employee has ever been threatened with discipline or even warned by a supervisor. Further, employees testified that other nonbusiness-related postings would remain on the bulletin board for weeks at a time without being removed. Additionally, there is no evidence on

the record that a policy previously existed at DynCorp that the bulletin board was for company use only. It was only after Dawkins spoke with Turner about the pro-union materials, that Dawkins placed a sign over the cafeteria bulletin boards that read "For DynCorp Business Only." The behavior of DynCorp up until the time Turner tried to post his flyers established a practice of allowing personal postings, and the refusal to adhere to that practice for pro-union materials amounts to a violation of the N.L.R.A. *See Union Carbide Corp.* 714 F.2d at 660. Thus, there is substantial evidence on the record to support the Board's conclusion that DynCorp's treatment of the pro-union materials was incongruent with, and more severe than, its treatment of other material posted on the bulletin boards.

DynCorp alternatively argues that even if it did engage in selective enforcement, it was lawful because it selectively enforced the policy by prohibiting all notices from organizations and allowing only those notices of an entirely personal nature. To support this argument, DynCorp cites *Fleming Cos. v. NLRB*, 349 F.3d 968, 975 (7th Cir. 2003), in which a court accepted a similar argument. We are unpersuaded by this argument. While DynCorp is able to identify a court that has accepted such an argument, it is unable to identify any facts on the record of this case that indicate that all postings affiliated with an organization were removed as the pro-union materials had been. In fact, the testimony regarding what types of postings were allowed to remain on the bulletin board was that "anything and everything" was allowed. (J.A. at 202; J.A. at 328). Because there are no facts supporting the argument that DynCorp consistently enforced its policy against all flyers affiliated with organizations, this argument cannot succeed.

### 2. Allegedly Coercive Comments or Threats

An employer violates § 8(a)(1) by "making statements, [which, when] considered from the employees' point of view, ha[ve] a reasonable tendency to coerce." *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005). Thus, it is irrelevant whether "any employee was in fact intimidated or coerced by the statements made;" the only question is if the statements had the objective tendency to coerce. *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 906 (6th Cir. 1997). In determining whether statements have such a tendency, "[t]he Board may take into account the 'economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.'" *Id*. (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

An employer is also forbidden under § 8(a)(1) from threatening employees with unfavorable conditions in the event of a union victory. *Henry I. Siegel Co. v. NLRB*, 417 F.2d 1206, 1214 (6th Cir. 1969). In *Henry I. Siegel*, we held that we will examine the context of statements and the atmosphere in which they were made to determine whether they constitute "a permissible forceful argument in opposition to the union or a veiled threat to the employees in the event the union should win the election." *Id*. In that case, some employees sought to organize the company. An election was scheduled, with the management and prominent figures in which the small town the company was located campaigning heavily against the union efforts. *Id.* at 1208. The alleged threats came from the managers of the company, Henry I. Siegel Co., and from the mayor of the city. *Id*. at 1208-12. The statements came in the forms of speeches, open letters to the employees, and letters printed in the newspaper. *Id*. Recurring themes in these statements were an expressed fear that violence

13

would erupt if the company was organized and fear that the friendly relationships between management and employees would "change" if the company was organized. *Id*. The mayor also stated that he thought the company could close if the union won the election. *Id*. at 1215.

In concluding that these statements constituted threats, this Court viewed each statement in light of the others. *Id*. We reasoned that statements about violence and strife when taken with statements that the cordial relationship between the employees and management would end was an implicit threat. *Id*. Further, we pointed out that the mayor's statement that the plant could close "when considered in light of the statements of company officials" was also an implied threat. *Id*. Thus, *Henry I. Siegel* stands for the proposition that we will view comments by company officials in light of contemporaneous threats and comments from other company officials when determining whether they constitute threats. The inquiry should examine the atmosphere of the workplace and how specific comments fit into that atmosphere to determine whether there was a "threatening color" to specific remarks. *See TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 420 (5th Cir. 1981). Further, we will pay considerable deference to the conclusion of the Board as to whether a comment constituted an impermissible threat. Importantly, "if the inference or conclusion found by the Board that the statements constitute a threat is a reasonable one, its findings will not be set aside on review even though a different inference or conclusion may seem more plausible." *Henry I. Siegel Co. v. NLRB*, 417 F.2d 1206, 1214 (6th Cir. 1969).

Supervisor Moore stated that the 30-cent-per-hour contribution made by the Company to the employee stock ownership plan would be "automatically" lost if the employees voted for union membership. As the Board has previously held, stating that employees will lose a fringe benefit if

14

they choose union representation constitutes an impermissible threat in violation of the N.L.R.A. *See Hertz Corp.*, 316 N.L.R.B. 672, 675, n.2 (1995). Further, because the statement came from a supervisor who has control over the benefits received, this statement has the tendency to coerce. *Torbitt*, 123 F.3d at 906. DynCorp contends that the intent of Moore was not to threaten the employees, but merely to convey the fact that if the union was elected, that DynCorp would be under no legal obligation to bargain. As DynCorp correctly observes, the Board has held in the past that a company could permissibly note that if a union were elected, there would be no obligation to start the bargaining process from the level of existing benefits, and benefits may disappear as a result. *Universal Producing Co.*, 123 N.L.R.B. 548, 549-50 (1958). Importantly, in that case, the manager making the statement explained that if a union were elected, all benefits, even those currently enjoyed by employees, would need to be renegotiated. *Id*. Thus, the manager speculated that certain benefits could have been lost because there would be no legal obligation to retain them. According to the Board, such an explanation for the basis of the prediction contextualized the statement so that it could not be viewed as a threat. *Id*. at 550. In the present case, Moore's statements came with no such contextualization. Accordingly, there was no way for employees to interpret the statement but as a threat that their benefits would be taken away automatically if the union won *because* the union won. Thus, there was substantial evidence that this statement constituted an impermissible threat.

### 3.     Allegedly Coercive Interrogations

"An employer violates section 8(a)(1) of the Act by coercively interrogating its employees about their union activities." *NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524, 527 (6th Cir. 1984). "The basic test for evaluating the legality of an interrogation is "'whether under all of the

circumstances the interrogation reasonably tends to restrain, coerce or interfere with rights guaranteed by the Act.'" *Dayton Typographic Serv. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir. 1985) (quoting *Rossmore House*, 269 N.L.R.B. 1176, 1177 (1984)). Thus, we will consider the employer's history of hostility toward the union, "the nature of the information sought, the questioner's identity, and the place and method of interrogation." *Id.*; *see also Architectural Glass & Metal Co. v. NLRB*, 107 F.3d 426, 434 (6th Cir. 1997).

These cases, however, do not hold that employers may never question employees about union matters. If an employee has a "legitimate reason" he or she may question employees about union matters. *Id*. We have defined a "legitimate reason" as when "[t]he nature of the information sought would be related to a legitimate policy of the employer." *Architectural Glass*, 107 F.3d at 434. Further, the Board has found questioning employees about participation in union movements to be permissible when that questioning is considered "causal and amicable" and where there is "no history of employer hostility towards or discrimination against union supporters." *Sunnyvale Medical Clinic, Inc.*, 277 N.L.R.B. 1217, 1218 (1985).

Relevant for the present case is our holding in *ITT Auto. v. NLRB* because it addresses the issue of employers "offering anti-union buttons to employees." 188 F.3d 375, 376 (6th Cir. 1999). In that case, we expressly held that this behavior is impermissible. Quoting the N.L.R.B., we held "that such behavior pressures employees to make a choice in public about whether to acknowledge their union sentiments and 'effectively puts employees in the position of either having to accept or reject the [employer's] proffer.'" *Id*. at 386-387 (quoting *A.O. Smith Automotive Prods*., 315 N.L.R.B. 994, 1009 (1994).

### a. Interrogation of Reynolds and Groves

As explained above, Reynolds and Groves were both approached by supervisors and offered "Vote No" buttons. DynCorp argues that these conversations were not intended to be coercive, nor were the questions delivered in a coercive way, and thus, that the Board did not have substantial evidence to support its finding that this inquiry was impermissible. However, DynCorp misstates the inquiry before this Court. We need not determine if the conversation between Reynolds and Wolfe actually did make Reynolds feel coerced or whether it was intended to do so. Instead, the question is whether it had the tendency to coerce. *Dayton Typographic Serv.*, 778 F.2d at 1194. Because we have previously held that an employer's offer of a "Vote No" button constitutes an impermissible interrogation, the inquiry before us is simple. *ITT Auto*, 188 F.3d at 386. This exchange constituted an impermissible interrogation.

### b. Interrogation of Godbey

Godbey's interaction with management differed from those of Groves and Reynolds because he was not offered a "Vote No" button. Instead, Lawrence, a supervisor, asked him where his "ornament" was, which was a reference to the "Vote Yes" button Godbey usually wore. (J.A. at 48-49). Admittedly, nothing about this incident taken alone would tend to coerce an employee. However, as the Board pointed out, this incident should not be considered in isolation. The fact that a number of these interrogations had taken place, the fact that they happened so close to the election, along with the fact that the questioning was being done by supervisors to their subordinates, all create substantial evidence that the questioning about Godbey's wearing "Vote Yes" buttons was coercive in nature. Further, it was well-known that the supervisors did not support the union and

17

from their actions seemed hostile to those supporting the union. Lawrence's reference to Godbey's "ornaments" was obviously facetious, and the tone of the conversation in light of the atmosphere at DynCorp gives the conversation on the whole a tendency to coerce. This was not the environment the Board found in *Sunnyvale Medical Clinic, Inc.*, where there was no reason for employees to fear anti-union animus. *See* 277 N.L.R.B. at 1218. By asking Godbey about his support of the union, the questioning necessarily had a coercive element to it. Thus, there was substantial evidence supporting the Board's conclusion and we therefore affirm this finding.

### c. Interrogation of Henderson and threat of onerous working conditions

Henderson was also asked by Lawrence where his "medals of honor" were, which was a reference to Henderson's "Vote Yes" button. (J.A. at 48). Lawrence then questioned Henderson about his involvement in the union organizing efforts, and when Henderson answered the questions and confirmed that he was involved in the campaign, Lawrence responded that he was "disappointed." (J.A. at 49). The tone of this conversation weighs strongly in favor of the N.L.R.B.'s finding that it was coercive. Lawrence's reference to "medals of honor," again, was obviously facetious and that, coupled with his expression of "disappointment" at Henderson's pro-union loyalties creates strong evidence that this interaction was improper. Further, the mere fact that Lawrence put Henderson in the position to have to reveal his level of activity in the union campaign when Lawrence was such a vocal opponent was improper. It effectively placed Henderson in a position similar to those employees being offered buttons in that it forced him to have to disclose his loyalties to a superior who did not share those loyalties. *See ITT Auto*, 188 F.3d at 386. Accordingly, the Board had substantial evidence to support its finding that this was impermissible.

Henderson was then denied assistance that he had always received in the past, which he interpreted as a threat about how things would be if the union were elected. It is worth noting that there is some discrepancy about the timing of Moore's and Lawrence's refusal to give Henderson the assistance that he requested. Henderson originally testified that he was interrogated in early February. He also testified that he was denied his requested assistance on February 19, 2000, and counsel corrected him that it had to be January 19, 2000. Thus, DynCorp points out that if these dates are correct, Henderson was denied assistance before the interrogation, so the denial cannot be seen as a reaction to that interrogation. However, Henderson additionally testified that he remembered the denial of assistance to come "the very next day" after the interrogation. (J.A. at 552; J.A. at 557). Thus, it is just as likely that Henderson was confused about the actual dates of the events as it is likely that he was confused about which incident came first. It is not the job of this Court to decide which of these equally plausible explanations is more likely. Because there is substantial evidence to support the conclusion that the Board made, we must sustain its finding. *Henry I. Siegel Co.,* 417 F.2d at 1214.

### 4.      Allegedly Impermissible Promises

This Court has expressly held that "[i]t is an unfair labor practice, however, to solicit employee grievances where the solicitation is accompanied by the employer's express or implied suggestion that the grievance will be resolved or acted upon only if the employees reject union representation." *V & S Schuler Eng'g*, 309 F.3d at 371. We have determined that a promise is no more lawful than coercion, and a promise will be presumed impermissibly influential unless the company can present a legitimate business reason for the timing of its guarantee. *See NLRB v.*

*Bailey Co*., 180 F.2d 278, 279 (6th Cir. 1950). Accordingly, the finding that a promise was made

by a member of management that certain problems will be resolved if a union is defeated amounts

to a violation of the N.L.R.A.

> In the present case, Dawkins told employees:

> I am forbidden by law to tell you today that I am going to make changes. But I can assure you that I recognize that there are changes that need to be made. It would be foolish for me not to address these issues. In fact it would be quite probable that significant changes would be made long before a contract is ratified.

(J.A. at 8). It is clear to this Court that this statement meets the *V & S Schuler Eng'g* standard of

impliedly suggesting that these grievances would be resolved if the union was defeated. *V & S*

*Schuler Eng'g*, 309 F.3d at 371. DynCorp emphasizes that the preface that he is "forbidden by law"

to make a promise negates any indication that what followed was a promise. We are unconvinced

and, in fact, that phrase reads as a rhetorical device that simply makes it more obvious that he was

making a promise. Further, he goes on to say it is "quite probable" that changes will be made and

that it would be "foolish" not to do so. Taken together with the fact that this speech was given so

close to the election, it is clear that a promise was implied in this language. Thus, the Board had

substantial evidence to conclude as it did and we, therefore, affirm its findings.

**II.     There was substantial evidence to support the Board's finding that DynCorp did not violate § 8(a)(1) or (a)(3) of the N.L.R.A. by terminating Grant Turner**

    **A.     Standard of Review**

As stated above, we review decisions of the Board under the highly deferential substantial

evidence standard. *Kamtech, Inc.*, 314 F.3d at 807. Thus, "where the evidence supports two

conflicting views, we may not disturb the Board's findings and its order must be enforced." *Talsol*

*Corp.*, 155 F.3d at 793.

### B.     Analysis

An employer violates § 8(a)(1) and (a)(3) when it discharges an employee because of that

employee's union activity or support of unionization. *Metro. Edison Co. v. NLRB,* 460 U.S. 693,

698 n.4 (1983). To determine if a discharge was improperly motivated by union activity, this Court

has embraced the *Wright Line* test. The *Wright Line* test, which was so named for *Wright Line*, 251

N.L.R.B. 1083 (1980) and was approved by the Supreme Court in *NLRB v. Transportation*

*Management Corp.*, 462 U.S. 393 (1983), requires "the general counsel of the N.L.R.B. to make a

showing sufficient to support the inference that the protected conduct was a motivating factor in the

employer's decision. At that point, the burden shifts to the employer to establish that the adverse

action would have taken place in the absence of the protected conduct, in the nature of an affirmative

defense." *Arrow Elec. Co. v. NLRB*, 155 F.3d 762 (6th Cir. 1998) (citation and footnote omitted).

Importantly, "circumstantial evidence alone may be sufficient to support a finding of unlawful

motivation." *Main St. Terrace Care Ctr.*, 218 F.3d at 541. Ultimately, an employer's motivation

is a question of fact, and, accordingly, this Court will not set aside the Board's finding in this regard

if there is substantial evidence to support it.

The *Wright Line* test initially requires the N.L.R.B. to make a prima facie case "by putting

forth evidence that supports an inference that the employee's protected activities were a motivating

factor in the employer's decision." *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir.

2000). This consists of showing that "the employee was engaged in protected activity; that the

21

employer knew of the employee's protected activity; and that 'an adverse employment action resulted in whole or in part from anti-union animus, or that the employee's protected conduct was a motivating factor in the adverse action.'" *Id*. (quoting *ITT Auto. v. NLRB*, 188 F.3d 375, 388 (6th Cir. 1999) (internal quotations omitted). Once this is shown, the company must show, by a preponderance of the evidence, that it would have taken the same action absent the protected activity. *Id*.

In the present case, the Board found that the General Counsel made its prima facie case. Even so, the Board ultimately determined that there was no violation because DynCorp was able to show that but for the protected activity, Turner would still have been fired. The Board pointed out that Turner's productivity levels had, in fact, dropped and this drop coincided with the threat of discipline. Additionally, when Turner was confronted with his low levels of productivity, he responded by taking credit for work he did not do, which is fraudulent and against the policy of DynCorp. The Board noted that Dawkins credibly testified that he was not aware that work-product sharing was a common practice, and there was insufficient evidence to impute such knowledge to him. The only supervisor who was willing to admit to encouraging the practice was Wolfe, who had left DynCorp sometime after the election and before Turner's dismissal. No supervisors who were employed at the time of Turner's dismissal corroborated Wolfe's assertion that the practice was encouraged by the supervisors. Thus, the Board characterized Wolfe's behavior as "rogue" and declined to impute Wolfe's knowledge of the practice to the rest of management. (J.A. at 51-52). Finally, the Board was persuaded by the fact that when Turner was asked whether he engaged in this practice, he lied to Dawkins, which is a valid reason for dismissal. Further, the Board also found that

Dawkins credibly testified that he did not see Turner's letter stating his intentions to begin the union campaign again until November 7, 2000, which was after Turner had already been discharged. Thus, the Board was unconvinced that Turner was fired because he was active in the union campaign and instead held that the termination was based upon legitimate reasons and was, therefore, lawful.

This issue presents a close case, as there are several facts that weigh strongly in favor of the argument that Turner was fired because of his participation in the union campaign. First, even though there was evidence that at least one supervisor had encouraged employees to share work product, no other employee had ever been disciplined, let alone fired, for this practice. Further, Turner was fired immediately after the incident occurred, while the other workers who shared their work product with Turner were fired four days later. If the impetus for the terminations was involvement in the work-product sharing, there is no reason that Turner should have been fired before anyone else. However, if the reason Turner was fired immediately was his dishonesty, it is not clear why the other employees, who were truthful about engaging in this practice, were fired at all. Indeed it raises suspicions that the other employees were fired only as an afterthought to avoid the appearance that Turner was being singled out. Coupled with the fact that Turner had been mistakenly given notices of discipline only a month earlier for excessive absences that were later discovered to be mistaken, this indicates that Turner's union participation may very well have been the motivation for these adverse actions. However, the existence of this evidence does not mean that substantial evidence does not also support the conclusion of the Board. Because the Board's conclusion is supported by substantial evidence, even though this Court may have held differently, we will affirm the findings of the Board. As we have previously held, "where the evidence supports

23

two conflicting views, we may not disturb the Board's findings and its order must be enforced."

*Talsol Corp.*, 155 F.3d at 793.

**III.    There was substantial evidence to support the Board's conclusion that the March 8, 2000 election results should be vacated and a new election should be ordered**

**A.    Standard of Review**

For the same reasons stated above, we review decisions of the Board under the highly deferential substantial evidence standard.  *Kamtech, Inc.*, 314 F.3d at 807.

**B.    Analysis**

The N.L.R.A. makes it unlawful for an employer to refuse to bargain with a union that the employees have chosen.  Section 8(a)(5) specifically states that it constitutes a violation of the Act for an employer to "refuse to bargain collectively with the representatives of his [or her] employees." Because it is undisputed that the union won the second election that the Board ordered, DynCorp's refusal to bargain constitutes a violation.

DynCorp makes the sole argument that the Board erred in determining that a new election was necessary, and, accordingly, it is under no obligation to recognize the results of that election. Specifically, DynCorp contends that the Board applied the incorrect legal standard when determining that a second election was necessary.  The Board counters that this argument is barred because DynCorp did not make the argument previously and cannot make it for the first time before this Court.

As we have consistently held, any argument raised for the first time on appeal is deemed waived and may not be addressed by this Court.  *See, e.g., United States v. Treadway*, 328 F.3d 878, 883 (6th Cir. 2003).  Not only did DynCorp fail to make this argument below, the portions of its brief

24

that purport to address the allegations of waiver are inexplicably missing. Thus, we decline to address this argument and conclude that because we affirm the findings of the Board that DynCorp violated the Act, substantial evidence existed to support its decision to order a new election. Thus, we will enforce the Board's order.

## CONCLUSION

For the forgoing reasons, we **AFFIRM** the findings of the Board with respect to the § 8(a)(1) violations and the termination of Turner and **ENFORCE** the Board's order in full; we **DENY** DynCorp's motion to review the Board's order.