J. Gordon BINGHAM, et al. (90-5401); and First Central Credit Union, J. Gordon Bingham, et al. (90-5402), Plaintiffs-Appellants,

v.

**NATIONAL CREDIT UNION ADMINISTRATION BOARD, Defendant-Appellee.**

Nos. 90-5401, 90-5402.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 29, 1991.

Decided March 6, 1991.

Albert H. Boyd (argued), Memphis, Tenn., for plaintiffs-appellants.

W. Hickman Ewing, Jr., U.S. Atty., Joe A. Dycus, Asst. U.S. Atty., Office of the U.S. Atty., Memphis, Tenn., Mary F. Rupp, John K. Ianno (argued), National Credit Union Admin., Washington, D.C., for defendant-appellee.

Before MILBURN and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiffs-appellants ("petitioners") in these consolidated cases appeal the dismissal of their petitions to show cause challenging the issuance of a temporary cease and desist order and the imposition of a

conservatorship by the National Credit Union Administration Board. For the reasons that follow, we affirm.

## I.

First Central Credit Union of Memphis, Tennessee (the "credit union") was chartered by the State of Tennessee and insured under the National Credit Union Share Insurance Fund, administered by the National Credit Union Administration ("NCUA"). The NCUA oversees credit unions in a similar manner as the FSLIC and the FHLBB oversee savings and loan associations.

In April 1984, the NCUA was contacted by the State of Tennessee to conduct a joint insurance review of the credit union. The insurance review was conducted by James Richardson, principal examiner for the NCUA in Memphis, Tennessee, and it revealed that the credit union was technically insolvent because the share ratio was approximately 99.5%, indicating that the shares were worth less than a dollar for a dollar.

In February 1989, Richardson conducted another insurance review of the credit union. This review revealed that the credit union was operating at a net loss of approximately $50,000 for the first two months of 1989. The credit union's loss was caused in part by delinquent loans and collection problems. Richardson testified that the NCUA's main concern was the future profitability of the credit union. Specifically, Richardson was concerned that the operating expenses of the credit union would increase due to four contracts it had entered into in January 1989 with J. Gordon and Brenda Bingham and companies owned by the Binghams. Bingham was the president of the credit union and the treasurer of the board of directors, and his wife was the vice-president of the credit union.

The four contracts were for management of the credit union, data processing services, insurance marketing, and a lease of the credit union building. The management contract paid the Binghams $48,000 per year for seven years. The data processing contract gave First Central Data Services, a company owned by the Binghams, the right to provide data processing services to the credit union for seven years for a fee of approximately $13,000 per month. The insurance marketing agreement gave Employee Insurance Consultants, another company owned by the Binghams, the sole right to market insurance to credit union members and to provide payroll deductions through the credit union for insurance premiums over a seven-year period. The Binghams owned the building in which the credit union was located, and under the lease agreement the Binghams received $6,000 per month from the credit union to rent 60% of the building space. J. Gordon Bingham purchased the building in 1986 for $175,000, and under the lease he received $72,000 per year for fifteen years.

By June 1989 the credit union's operating expense to gross income ratio was 75.5%, compared to a peer group average of 34.9%. Also, by June of 1989 the credit union's losses on loans were six times that of its peer group. In July 1989, a Letter of Understanding and Agreement was entered into by the credit union, the State of Tennessee and the NCUA. James Richardson testified that the purpose of the agreement was to cause the credit union's board of directors to take the actions necessary to correct deficiencies in the operation of the credit union.

At a meeting in August 1989, the credit union's board of directors presented a proposed budget to the NCUA showing a loss of $99,000 over the next twelve months. The NCUA found this budget to be unacceptable because it indicated that the credit union would be insolvent within one year. The NCUA gave the credit union officials thirty days to present a revised budget showing that the credit union could become profitable. The credit union officials prepared a revised budget, and James Richardson testified that he reviewed the budget and determined that it was unrealistic because it was based on projections not supported by the facts. Richardson testified that the credit union projected income increasing at 1% per month with loans in-

creasing at the same rate, but the credit union's history over the past several months revealed that loans were decreasing at a rate of 18 to 20% per month. The budget also projected an increase in shares of 16 or 17% per annum, but the credit union's growth rate for the past three to four years had been 5 to 6%.

On October 31, 1989, the credit union submitted a statement of financial condition to the NCUA which revealed that the credit union had lost $273,563.23 from January through October 1989. Based upon these losses and the credit union's inability to submit a realistic budget, Richardson recommended that the NCUA place the credit union into conservatorship to conserve its assets. Ben Mauldin, NCUA's region III Director of Special Actions, concurred with Richardson's recommendation based on the rapidly deteriorating financial condition of the credit union. Mauldin testified that the credit union's capital had declined rapidly over the preceding ten months, and the credit union was operating at a substantial loss.

On December 14, 1989, the NCUA Board moved to place the credit union into conservatorship. On December 15, 1989, NCUA officials served an order of conservatorship and a consolidated notice of charges and hearing and temporary cease and desist order on J. Gordon Bingham at the credit union. The order of conservatorship notified the credit union's officials and board of directors that the NCUA was appointing itself conservator of the credit union pursuant to 12 U.S.C. § 1786(h)(1) in order to conserve the assets of the credit union, to protect the share insurance fund, and to protect the interests of the credit union members. The order of conservatorship identified excessive loan losses, profitability, capital erosion, unsafe and unsound contracts, and failure to comply with the letter of understanding and agreement as problems at the credit union which necessitated imposing the conservatorship.

The temporary cease and desist order directed J. Gordon Bingham, Brenda Bingham, and their companies, First Central Data Services, First Central Financial Services, and Employee Insurance Consultants, not to interfere with the NCUA's exercise of its duties as conservator of the credit union. The Binghams were ordered to immediately cease and desist from entering the credit union premises without the written permission of the NCUA. The Binghams and their companies were also ordered to continue to provide adequate space for the credit union under the lease agreement and to provide data processing services under the data processing contract. The order notified the Binghams that a hearing would be held to determine whether a permanent cease and desist order should be issued.

On December 26, 1989, J. Gordon Bingham filed a petition to show cause in the district court challenging the order of conservatorship.[1] On the same date, Bingham, his wife, and their three companies filed a petition to show cause challenging the consolidated notice of charges and hearing and temporary cease and desist order. A hearing was scheduled for January 5, 1990, but it was continued to January 17, 1990, at the request of the NCUA. On January 16, 1990, the NCUA filed in the district court a notice of filing of notice of dismissal of temporary cease and desist order and notice of charges and hearing, stating that the temporary cease and desist order had been dismissed by the NCUA.

At the hearing on January 17, 1990, the NCUA asserted that its notice of dismissal mooted the petition challenging the temporary cease and desist order. Counsel for petitioners conceded in response to questioning by the district judge that the case was moot with regard to the temporary cease and desist order. Accordingly, no evidence was presented on that issue at the hearing, and the district court did not rule on the merits of the petition challenging the temporary cease and desist order. On January 31, 1990, the district court entered

---

1. On January 31, 1990, the district court granted Bingham's motion to amend the complaint to add First Central Credit Union as a plaintiff.

an order dismissing the challenge to the temporary cease and desist order holding that it was moot.

Following a two-day evidentiary hearing on the challenge to the conservatorship on January 17–18, 1990, the district court held that the NCUA's decision to place the credit union into conservatorship was not arbitrary and capricious. The district court stated that the record indicated the NCUA had ample reason under the federal statute to impose the conservatorship. On January 31, 1990, the district court entered an order dismissing the challenge to the conservatorship. The Binghams and their companies timely filed the present appeals, and this court consolidated these appeals.

The principal issues on appeal are: (1) whether the district court erred by dismissing the petition challenging the temporary cease and desist order as moot, and (2) whether the district court erred by dismissing the petition challenging the conservatorship.

## II.

### A. Temporary Cease and Desist Order

■ Petitioners argue that the NCUA's unilateral dismissal of the temporary cease and desist order did not render this action moot because they did not consent to the dismissal. Although petitioners did not consent to the NCUA's dismissal of the temporary cease and desist order, petitioners' counsel did concede in response to questioning by the district judge at the hearing that the effect of the dismissal was to render the action moot. *See* J.A. at 106. The petition challenging the temporary cease and desist order requested that the order be set aside. Thus, when the NCUA dismissed the temporary cease and desist order prior to the hearing, the petition became moot because petitioners received the relief they requested. *See International Union v. Dana Corp.*, 697 F.2d 718, 720 (6th Cir.1983) (en banc). Moreover, we note that this is not the type of case to

which the "capable-of-repetition, yet evading review" exception to mootness is applicable. That exception applies to cases which evade review because the practice at issue is inherently short in duration even though capable of repetition. See *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C.Cir. 1985) (elections, trials, pregnancies, and public school years). Because petitioners received the relief requested and conceded the mootness issue in the district court, we hold that the district court properly dismissed as moot the petition challenging the temporary cease and desist order.

### B. Conservatorship

In the petition challenging the conservatorship, petitioners requested that the order of conservatorship be vacated and set aside and that the NCUA be required to show cause why it should not be enjoined from continuing possession and control of the credit union.[2] At the conclusion of the hearing on the petition, the district judge orally ruled that the NCUA's imposition of the conservatorship was not arbitrary and capricious and that "the procedure was carried out in precisely the manner the statute provided." J.A. at 276. The district judge also made the following findings of fact: "The credit union is losing money, it has suffered operating losses, it had operating problems, there's a serious problem in the contracting procedure and possible conflicts of interest...." J.A. at 275–76.

On January 31, 1990, the district court entered an order incorporating the oral findings of fact and conclusions of law stated at the hearing. The district court indicated that the standard of review under the Federal Credit Union Act is restricted to determining whether the actions taken by the NCUA were arbitrary and capricious. The district court stated:

> The administrative record and the testimony and exhibits introduced at the hearing of this matter demonstrate that the Administration had a reasonable ba-

---

**2.** The NCUA asserts that petitioners' challenge to the conservatorship has been rendered moot because the credit union has been liquidated by the State of Tennessee, and purchased and as-

sumed by another credit union. However, this was not in the record before the district court, and it is not properly before this court.

sis for its determination that a conservatorship was necessary under the standards of 12 U.S.C. § 1786(h)(1)(A). Further, the proof and exhibits put forth by the plaintiffs failed to demonstrate that the actions of the Administration were arbitrary and capricious.

J.A. at 74.

■ Petitioners assert that the standard of review is broader than that employed by the district court, but they do not indicate what the standard should be, and they do not cite any authority for a different standard. Independent research has revealed no case stating the standard for reviewing the NCUA's *ex parte* appointment of itself as conservator under section 1786(h)(1).

In the absence of explicit authority on this issue, we employ the standard used by the Fifth and Eleventh Circuits to review a decision of the Federal Home Loan Bank Board (FHLBB) to appoint a receiver or conservator. *See Alliance Federal Savings and Loan v. FHLBB*, 782 F.2d 490, 493 (5th Cir.1986); *Biscayne Federal Savings and Loan v. FHLBB*, 720 F.2d 1499, 1503 (11th Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). These cases hold that the sole inquiry on judicial review is whether a statutory ground existed for the FHLBB's appointment of a conservator or a receiver.

■ Section 1786(h)(1) specifies four circumstances in which the NCUA Board may, *ex parte* without notice, appoint itself as conservator of an insured credit union:[3]

(A) the Board determines that such action is necessary to conserve the assets of any insured credit union or to protect the Fund or the interests of the members of such insured credit union;

(B) an insured credit union, by a resolution of its board of directors, consents to such an action by the Board;

(C) there is a willful violation of a cease-and-desist order which has become final; or

(D) there is concealment of books, papers, records, or assets of the credit union or refusal to submit books, papers, records, or affairs of the credit union for inspection to any examiner or to any lawful agent of the Board.

12 U.S.C. § 1786(h)(1).

At the conclusion of the hearing, the district court found that the credit union was losing money, had suffered operating losses, had operating problems, had serious problems with its contracting procedure, and a possible conflict of interest. The district court's findings are supported by the testimony of James Richardson and Ben Mauldin regarding the rapidly deteriorating financial condition of the credit union. The district court concluded that the record indicated that the NCUA had ample reason under the statute to impose the conservatorship.

Petitioners do not challenge the district court's findings regarding the financial condition of the credit union. The district court's findings support the NCUA's imposition of the conservatorship pursuant to section 1786(h)(1)(A) to conserve the assets of the credit union, to protect the share insurance fund, and to protect the interests of the credit union members. Based on these undisputed findings, we hold that a statutory ground existed for the NCUA to impose the conservatorship pursuant to section 1786(h)(1)(A).[4]

### III.

For the reasons stated, we AFFIRM the district court's judgments and orders of dismissal in both cases.

3. Petitioners assert that they were denied due process by imposition of the conservatorship prior to a hearing. We dispose of this argument on the basis of the Supreme Court's ruling in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), which upheld a pre-hearing seizure of bank assets by a conservator appointed by the Federal Home Loan Administration.

4. We dispose of other arguments by petitioners as being meritless or raised for the first time on appeal. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).