RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CATERPILLAR LOGISTICS, INC.,

              *Petitioner/Cross-Respondent,*

    *v.*

NATIONAL LABOR RELATIONS BOARD,

              *Respondent/Cross-Petitioner,*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

              *Intervening Respondent.*

Nos. 15-1433/1611

On Petition for Review and Cross Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 09-CA-110687; 09-CA-114560; 09-CA-120356; 09-RC-111362.

Argued: March 10, 2016

Decided and Filed: July 19, 2016[*]

Before: COLE, Chief Judge; MERRITT and GRIFFIN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Joseph J. Torres, WINSTON & STRAWN LLP, Chicago, Illinois, for Petitioner/Cross-Respondent. Valerie L. Collins, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Kristin Seifert Watson, CLOPPERT, LATANICK, SAUTER & WASHBURN, Columbus, Ohio, for Intervening Respondent. **ON BRIEF:** Joseph J. Torres, Derek G. Barella, Heather S. Lehman, WINSTON & STRAWN LLP, Chicago, Illinois, Mary M. Lenahan, WINSTON & STRAWN LLP, Washington, D.C., for Petitioner/Cross-Respondent. Valerie L. Collins, Julie B. Broido, Linda Dreeben, NATIONAL

---

[*]This decision was originally issued as an unpublished opinion filed on July 19, 2016. The court has now designated the opinion as one recommended for full-text publication.

1

LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Kristin Seifert Watson, CLOPPERT, LATANICK, SAUTER & WASHBURN, Columbus, Ohio, for Intervening Respondent.

———————

**OPINION**

———————

MERRITT, Circuit Judge. In this labor relations case, Caterpillar Logistics, Inc. ("Caterpillar") petitions for review of an order of the National Labor Relations Board ("the Board") finding that Caterpillar committed unfair labor practices in connection with a 2013 representation election and also unlawfully discharged an employee. The Board cross-applies for full enforcement of its order. Reviewing the administrative record for substantial evidence, we affirm the Board's order in full. Caterpillar's petition for review is thus **DENIED**, and the Board's application for enforcement is **GRANTED**.

## I. Factual and Procedural History[1]

On September 27, 2013, employees at Caterpillar's Clayton, Ohio facility voted on whether they would be represented as a union by the United Automobile Workers ("UAW"). The representation election failed; 188 employees voted for representation, and 229 voted against. In October 2013, the UAW filed objections to conduct that allegedly violated the National Labor Relations Act ("the Act") and impacted the election results. Particularly relevant here, the UAW objected to two instances of interrogation, the creation of the impression of improper surveillance, and the improper announcements of an employee bonus and new smoking shelters shortly before the vote.

The first alleged instance of interrogation and the alleged instance of the creation of an impression of surveillance occurred during a workday in late August 2013. The night before, the UAW held its first organizing meeting, with no supervisors or management personnel in attendance. The following day at work, Caterpillar supervisor Nick Ewry approached employee

———

[1]Because we hold that the administrative fact-finding was supported by substantial evidence, *see infra* Part II, we primarily rely on those facts in this summary. While we document some major factual disputes here, we ultimately accept the administrative adjudicators' resolution of those disputes. *Id.*

(and meeting attendee) John Sponsler, who was working alone at the time, and asked Sponsler what he thought about the union. Sponsler explained that he favored unionization but that he feared retaliation if the union vote failed. Prior to this encounter, he had never revealed his union support to a manager or supervisor and was "extremely nervous about anyone knowing about" his involvement.

According to Sponsler, Ewry responded that he did "not think [Sponsler] had anything to worry about," that "he did not think there would be any retaliation whatsoever, and that upper management already knew everyone that . . . [was] involved." Afterwards, Sponsler spoke to multiple colleagues about his encounter with Ewry, and told them that he "was afraid that someone had given the company information and surveilled [the union] meeting, because of [Ewry's] comment about upper management knowing everyone . . . involved."

The second alleged instance of interrogation occurred around the same time. Following a mandatory anti-union meeting organized for employees by the management, supervisor Cory Butcher approached employee Marquis Applin while Applin was working alone and proceeded to ask Applin what he thought about the meeting and whether he had made a voting decision. Butcher also said that if the union vote succeeded, he would no longer be able to talk to Applin "one on one." During the conversation, Applin was "nervous" and "kind of shocked," and he later testified that he tried not to indicate that he was a union supporter for fear of being fired. Applin would later relay his encounter with Butcher to other Caterpillar employees.

The first alleged instance of an improper announcement of an employee benefit came at an employee meeting on September 18, when Caterpillar General Manager Brian Purcell and Safety Manager Kevin Rivera announced to plant employees a one-time $400 safety bonus, which was ultimately paid out in December 2013. Many employees claim they were first notified of the impending bonus at that meeting. Caterpillar argues that it explained to employees in both March and July 2013 that the award was forthcoming upon a successful submission for the company's "Chairman's Safety Award."

The second alleged instance of an improper announcement of an employee benefit came at the same September 18 meeting, when Caterpillar announced to employees for the first time

that it would be constructing covered smoking shelters in the outdoor break areas used by employees that smoked.  Since at least 2011, employees had consistently complained about the designated smoking areas in use at the time, which were uncovered and difficult to reach in bad weather.  The smoking shelters were ultimately constructed in March 2014.

The representation election was held on September 27, and a majority of employees voted against unionization.  In October, the UAW filed its objections to the election, alleging interrogation, the impression of surveillance, and the improper announcement of benefits.

On November 14, while the UAW's objections were pending, Caterpillar held an employee meeting to announce the construction of a guard shack.  At the meeting, employee Michael Craft asked what the shack was for.  General Manager Purcell responded that the shack was "for guards," eliciting laughter from the other employees present.  Purcell's dismissive response upset Craft, who relayed the incident to two coworkers the next day at work.  According to supervisor Jason Brown, who overheard the remarks, Craft told them:

> You guys (union supporters) just gained another supporter, I'm sick of the way they treat us in here, He (Brian Purcell) thinks he can treat us like he treated the thugs he managed in Denver, I'm not putting up with it anymore, I'm sick of it, that motherfucker is going down now, the gloves are fucking off now . . . .

Brown asked Craft why he was upset.  According to Brown,

> [Craft] stated that he felt embarrassed and made out to look foolish [by Purcell].  [Craft] continued to say that he was for the union now due to the way Brian Purcell is treating the associates like they were thugs. . . . Mike said that he never meant he wanted to do physical harm to Brian Purcell he just meant that he wanted Brian to be held accountable for his actions towards Mike Craft.

Brown reported the incident to Assistant Value Stream Manager John Gruet, who then reported it to Purcell and Human Resources Manager Jason Murphy.  Gruet also told them: "I don't believe Mike is a violent person but he is upset.  I don't believe Mike intended physical harm . . . ."  Nonetheless, Murphy decided to suspend Craft, and Purcell later reported the incident to police and terminated Craft's employment.  Craft filed an objection with the Board, arguing that he had been terminated in violation of the Act.  His complaint was consolidated with the UAW's pending election objections.

On August 4, 2014, an Administrative Law Judge ("the Judge") issued a decision finding that Ewry and Butcher had violated the Act by interrogating employees about union sympathies "during the critical period between the filing of the representation petition and the election," and that Purcell had violated the Act by announcing the safety bonus and smoking shelters during the critical period.  The Judge also found that Michael Craft was discharged in violation of the Act because his outburst had amounted to protected activity and was not sufficient to forfeit the Act's protection.  The Judge ordered Caterpillar to: reinstate Craft with back pay; cease and desist from unfair labor practices; and post and distribute a notice advising employees of their rights, acknowledging its violations, and listing the remedial measures it was taking.  The Judge also ordered that the election results be set aside and a new election held.

On appeal, the Board affirmed the order of the Judge, except to the extent that it also found that Ewry violated the Act by creating the impression of surveillance and modified the ordered remedies to reflect the finding of surveillance.

Caterpillar now petitions for review of the Board's decision and order, arguing that the Board's order should not be enforced because Caterpillar did not violate the Act through interrogation, the creation of the impression of surveillance, the improper announcement of benefits, or the dismissal of Craft.[2]  The Board cross-applies for full enforcement of its order.

## II.  Discussion

"Our review of the Board's decision is quite limited."  *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997).  We defer to the Board's factual determinations if they are supported by substantial evidence on the record as a whole.  29 U.S.C. §§ 160(e), (f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[2]Among its positions, Caterpillar argues that we should review and overturn the Board's order setting aside the representation election and ordering a new one.  It is a well-settled rule, however, that such an order is not "final" and thus is not subject to our appellate review.  *U.S. Elec. Motors v. NLRB*, 722 F.2d 315, 320 (6th Cir. 1983) (per curiam) (citing *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401 (1940); *NLRB v. Int'l Bhd. of Elec. Workers*, 308 U.S. 413 (1940)) (additional citations omitted).  Moreover, Caterpillar conceded the mootness of this claim in a letter to our Court announcing that the second election had been conducted and a majority of employees again voted against representation.  *See Bingham v. Nat'l Credit Union Admin. Bd.*, 927 F.2d 282, 285 (6th Cir. 1991) (affirming dismissal of claims that petitioners' concede were moot).

*Dupont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002) (citation and internal quotation marks omitted). Our review of fact-finding is even more deferential for credibility determinations: "We will overturn those determinations only if they overstep the bounds of reason," *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir. 1984) (citation and internal quotation marks omitted), or "unless they are inherently unreasonable or self-contradictory," *Tel Data Corp. v. NLRB*, 90 F.3d 1195, 1199 (6th Cir. 1996) (citation and internal quotation marks omitted). The Board's application of law to the facts is also reviewed for substantial evidence, *NLRB v. Mead Corp.*, 73 F.3d 74, 78 (6th Cir. 1996), and its "[c]onclusions of law are subject to a de novo review, although [we] will uphold the Board's reasonable interpretation of the [National Labor Relations Act] where Congress has not spoken to the contrary on the same issue." *Dupont Dow Elastomers*, 296 F.3d at 500 (citation omitted).

## A. Unfair Labor Practices

The National Labor Relations Act guarantees to employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of [these] rights . . . ." *Id.* §§ 158(a), (a)(1). An unfair labor practice "occurs when substantial evidence demonstrates that the employer's [actions], considered from the employees' point of view, had a reasonable tendency to coerce." *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005) (citation omitted). A finding of "actual coercion" is not required. *Id.* (citation omitted). "In making [an unfair labor practices] determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees." *NLRB v. Okun Bros. Shoe Store*, 825 F.2d 102, 105 (6th Cir. 1987).

### 1. Interrogation

Coercive interrogation of employees about union activities constitutes an unfair labor practice in violation of 29 U.S.C. § 158(a)(1). *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524,

527 (6th Cir. 1984) (citations omitted). "[T]he basic test for evaluating the legality of an interrogation is 'whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act.'" *Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir. 1985) (quoting *Rossmore House*, 269 N.L.R.B. 1176, 1177 (1984)). "When assessing the coercive tendency of an interrogation, the [Board] looks at, among other things, the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation." *Id.* (citation omitted).

### a. The Interrogation of John Sponsler

The Judge concluded that Ewry's questioning of Sponsler was an attempt to assess Sponsler's position on unionization in order to report it to Caterpillar corporate labor relations official Ron Hassinger, and that such questioning was coercive because it closely followed a management-organized anti-union meeting for employees. The Board agreed with this conclusion.

Substantial evidence supports the Board's conclusion that Sponsler's questioning of Ewry amounted to coercive interrogation in violation of the Act. This conclusion is supported by: the background of the exchange, in that an anti-union meeting had been held the day before and Sponsler's union support was private; the nature of the information sought, in that Ewry clearly sought Sponsler's position on the union; the questioner's identity, in that Ewry was Sponsler's supervisor; and the place and method of interrogation, in that Ewry approached Sponsler on the work floor while Sponsler was alone, a situation in which he might have felt more vulnerable than if he had been surrounded by his peers. The Board reasonably concluded that this encounter had a reasonable tendency to coerce. *See Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1359 (D.C. Cir. 1997) (quoting *Struksnes Constr. Co.*, 165 N.L.R.B. 1062, 1062 (1967)) ("[A]ny attempt by an employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of unionism and, therefore, tends to impinge on his [National Labor Relations Act] rights.") (internal quotation marks omitted).

b. The Interrogation of Marquis Applin

The Judge also concluded that Butcher's questioning of Applin was an attempt to assess Applin's position on unionization in order to report it to Hassinger, and that such questioning was coercive because it closely followed the mandatory anti-union meeting for employees. The Board agreed with this conclusion.

Substantial evidence supports the Board's conclusion that Butcher's questioning of Applin amounted to coercive interrogation in violation of the Act. This conclusion is supported by evidence similar to the evidence supporting the conclusion that Sponsler was coercively interrogated: an anti-union meeting had been held the day before; Butcher clearly sought Applin's position on the union; Butcher was Applin's supervisor; and Butcher approached Applin on the work floor while Applin was alone, a potentially vulnerable setting. *See Allegheny Ludlum Corp.*, 104 F.3d at 1359; *supra* Part II.A.1.a.

2. Surveillance

Creating the impression that employees' union activities are under surveillance constitutes an unfair labor practice in violation of 29 U.S.C. § 158(a)(1), *see NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 538, 550 (6th Cir. 1984), because "employees should be free to participate in union organizing campaigns without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways." *Flexsteel Indus.*, 311 N.L.R.B. 257, 257 (1993). A finding of actual surveillance is not required; "the test for determining whether an employer has created an impression of surveillance is whether the employee would reasonably assume from the statement that their union activities had been placed under surveillance." *Id.*

The Board found that Erwy created the impression of surveillance when, during his discussion of union activities with Sponsler, he said "that upper management already knew everyone that . . . [was] involved." This finding is supported by substantial evidence. Sponsler testified that he had attended an off-site union meeting the day before, that he had not publicly indicated support for the union, and that Ewry did not disclose his source of information. The Judge credited Sponsler's testimony, and Caterpillar makes no argument that that credibility

determination overstepped the bounds of reason or was inherently unreasonable or self-contradictory.

Thus, Ewry indicated to Sponsler that management was aware of protected labor activities without revealing his source, thereby creating an impression that protected activity had been improperly surveilled. *See Sam's Club*, 342 N.L.R.B. 620, 620-21 (2004) ("[Manager] Roberts' telling [employee] Peto that he 'heard Peto was circulating a petition about wages' leads reasonably to the conclusion that the [employer] had been monitoring Peto's activities. Peto did not circulate the petition openly, and Roberts never revealed how he came by the information.").

### 3. Impermissible Promising of Benefits

The promise or conferral of a benefit to employees in the run-up to a union election will typically amount to coercion, and thereby an unfair labor practice in violation of the Act. *See NLRB v. Bailey Co.*, 180 F.2d 278, 279 (6th Cir. 1950) ("[T]hrough the promises of . . . economic benefits . . . , the respondent was demonstrating to its employees that resort to self-organization was plainly unnecessary. This constituted interference with the exercise by the employees of their right of self-organization and collective bargaining through representatives of their own choosing."). "[T]he critical inquiry is whether the benefits were granted for the purpose of influencing the employees' vote in the election and were of a type reasonably calculated to have that effect." *United Airlines Servs. Corp.*, 290 N.L.R.B. 954, 954 (1988) (citing *NLRB v. Exchange Parts Co.*, 375 U.S. 405 (1964)). "[U]nless the company can present a legitimate business reason for the timing of its guarantee," such "a promise [of benefits] will be presumed impermissibly influential." *DynCorp, Inc. v. NLRB*, 233 F. App'x 419, 430 (6th Cir. 2007) (citing *Bailey Co.*, 180 F.2d at 279).

### a. The $400 Safety Bonus

The Judge found that there "was no reason for Brian Purcell to announce [in September] the fact that employees would be receiving the bonus in December other than to influence them in voting in the representation election" and that "the announcement was motivated by [Caterpillar's] desire to discourage unit employees from voting for union representation,"

because there was "no credible evidence that a firm decision had been made to pay employees the $400 bonus prior to the filing of the representation petition on August 16." Thus, the Judge found that the announcement of the safety bonus was an impermissible benefit amounting to an unfair labor practice in violation of 29 U.S.C. § 158(a)(1). The Board agreed with these findings.

Caterpillar continues to argue that the bonus was first announced in March or July of 2013, when it would not have influenced an impending representation election. But the Judge credited the testimony of twelve employees who recalled no such announcements, and found that *even if* Caterpillar's witnesses were credited, their testimony would indicate at most that Caterpillar announced in March or July that *it might apply* for the bonus, without conclusively indicated *if or when* an application would be made. The Board agreed with these findings.

The Board's findings are supported by substantial evidence. We agree that "a reasonable mind might accept as adequate [the evidence] support[ing]" the Board's conclusion that even if Caterpillar's witnesses are credited regarding the purported March and July announcements, these announcements indicated at most that Caterpillar *might apply* for the safety bonus. *Dupont Dow Elastomers*, 296 F.3d at 500 (citation and internal quotation marks omitted). For instance, Value Stream Manager Sara Pahlas testified that then-General Manager Jeff Slocum presented to employees at the March meeting the proposal for the safety bonus, reading from a PowerPoint presentation. The PowerPoint presentation that was purportedly displayed to employees at the meeting says conditionally that a bonus will be paid out to employees "IF AND ONLY IF we are positioned to submit a viable safety program for consideration in the annual 'Chairman's Safety Award' Process." Likewise, Safety Manager Rivera testified that, at the July meeting, he "covered the two projects that [he] thought we would be submitting, or we thought we would be submitting for that award." Assuming these announcements were in fact made — which the testimony of the twelve employees draws into doubt — adequate evidence suggests they were conditional at best.

Thus, the Board and the Judge reasonably determined that employees were told for the first time, nine days before the election, that they *would be* receiving a bonus of $400. The Board and the Judge could have reasonably concluded that the bonus was "granted for the

purpose of influencing the employees' vote in the election and [was] reasonably calculated to have that effect." *United Airlines Servs. Corp.*, 290 N.L.R.B. at 954. And even if the bonus was warranted for business reasons (like safety), Caterpillar cannot provide a "legitimate business reason for the *timing* of its guarantee" in order to rebut the presumption that the announcement of the bonus was impermissibly coervice. *DynCorp*, 233 F. App'x at 430 (emphasis added). Indeed, the timing of the announcement reinforces the presumption that it was intended to coerce. Although the bonus was to be awarded on the basis of warehouse safety through the end on September 2013, the application was prepared in August, submitted on September 13, and announced of September 18 — just nine days before the election. Thus, substantial evidence supports the conclusion that the bonus was impermissibly secured "right before an election and sprung on the employees in a manner calculated to influence the employees' choice." *NLRB v. Arrow Elastic Corp.*, 573 F.2d 702, 706 (1st Cir. 1978); *see also St. Francis Fed'n of Nurses & Health Profs. v. NLRB*, 729 F.2d 844, 850 (D.C. Cir. 1984) ("Thus the timing of the announcement of a [benefit] may violate section [158(a)(1)], even though the employer's initial decision to [provide the benefit] was perfectly legitimate.")

## b. The Smoking Shelters

The Judge found that the promised smoking shelters amounted to a benefit, and that the timing of their announcement was "designed to convince the employees that their demands would be met through direct dealing with [Caterpillar] and that union representation could in no way be advantageous to them." The Judge thus found that the announcement of smoking shelters amounted to an unfair labor practice in violation of the Act. The Board agreed with the Judge's conclusions.

Substantial evidence supports the Board's conclusion that the announcement of smoking shelters amounted to an unfair labor practice in violation of 29 U.S.C. § 158(a)(1). The shelters were a solution to a problem that Caterpillar employees had complained of for a long time, and the shelters were announced for the first time shortly before the election. That the shelters were purportedly a response to safety concerns about uncovered smoking areas does not necessarily mean that there was a "legitimate business reason for the timing" of their announcement.

*DynCorp.*, 233 F. App'x at 430; *see St. Francis Fed'n of Nurses & Health Profs.*, 729 F.2d at 850.

The timing here indicates that neither safety nor any other legitimate purpose was the primary reason for the announcement that shelters would be constructed, and that in fact the announcement was "for the purpose of influencing the employees' vote in the election and [was] of a type reasonably calculated to have that effect." *United Airlines Servs. Corp.*, 290 N.L.R.B. at 954. Specifically, employees had complained for years about the exposed outdoor smoking areas, but no action was taken to address the issue until the shelters were announced nine days before the election. Further undercutting the purported safety rationale is the fact that the shelters were not in fact constructed until March of 2014, forcing employees to endure another winter in the exposed smoking areas. The Board's conclusion that the announcement of the shelters amounted to an unfair labor practice is therefore supported by substantial evidence.

**B. The Discharge of Michael Craft**

The Act prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. §§ 158(a), (a)(3). But an employee who engages in "opprobrious conduct" can forfeit these protections. *Atlantic Steel Co.*, 245 N.L.R.B. 814, 816 (1979). "It is well established that 'although employees are permitted some leeway for impulsive behavior when engaged in concerted [organizing] activity, this leeway is balanced against an employer's right to maintain order and respect.'" *DaimlerChrysler Corp.*, 344 N.L.R.B. 1324, 1329 (2005) (quoting *Piper Realty*, 313 N.L.R.B. 1289, 1290 (1994)). "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity, the employee forfeits the Act's protection. Whether the Act's protection is lost depends on a balancing of four factors: (1) the place of the discussion between the employee and the employer; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Id.* (citing *Atlantic Steel Co.*, 245 N.L.R.B. at 814). Although the Board's findings of fact and application of law to fact are otherwise reviewed for substantial evidence, *see Universal Camera*, 340 U.S. at 477, 488; *Mead Corp.*, 73 F.3d at 78, the Board's determination of whether an employee has forfeited the

protections of the Act is conclusive "unless it is illogical, arbitrary, or unreasonable," *NLRB v. Honda of Am. Mfg., Inc.*, 73 F. App'x 810, 813 (6th Cir. 2003) (citing *NLRB v. Hartmann Luggage Co.*, 453 F.2d 178, 183-84 (6th Cir. 1971)).

Here, the Judge determined that Craft was involved in protected activity during his outburst by telling his coworkers that he was a union supporter because of what he interpreted as his employer's disrespectful treatment of employees. The Board agreed with this conclusion. The Judge also assessed the outburst according to the *Atlantic Steel* factors, and determined that Craft had not forfeited the Act's protections. Specifically, he concluded that:

> [T]he place of the discussion, on the warehouse floor cuts both ways. Craft disrupted work for a very brief period of time. On the other hand, the seriousness of his misconduct is somewhat lessened by the fact that Brian Purcell was not present when he made his remarks. . . . Moreover, Craft's statement was not accompanied by any threatening physical gestures . . . which also weighs in favor of a finding that he did not lose the Act's protection. [T]he subject of the discussion: Craft's newly discovered support for the Union cuts in favor of a finding that he did not lose the protection of the Act. [The nature of the outburst] is the most important. Without the first sentence, Craft's statements are certainly a threat which would lose him the protection of the Act. However, the M-fer going down, the gloves are off has to be placed in context. The statement makes no sense if one interprets it as I am going to kill or assault Brian Purcell and then support the Union . . . . [Provocation:] Purcell certainly did not provoke Craft by committing any unfair labor practice. . . . However, I conclude that this is an insufficient reason to deny Craft the protection of the Act in view of the other factors.

Thus, the Judge found that Craft had been "discriminatorily discharged" for engaging in behavior protected by the Act, and ordered his reinstatement. The Board also agreed with the conclusion that Craft had not forfeited the Act's protections and was entitled to reinstatement.

Because Craft's outburst to his colleagues was an expression of union support and a complaint about perceived working conditions, the Board's determination that it amounted to protected activity under the Act is supported by substantial evidence. *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .").

Moreover, we find nothing "illogical, arbitrary, or unreasonable" about the Board's application of the *Atlantic Steel* factors and determination that Craft did not forfeit the Act's protections. Craft's outburst was plainly an expression of union support and a complaint about perceived working conditions, and while it may well have been crudely stated, it can reasonably be viewed in context as metaphorical speech rather than threatening speech. *See Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 28 (D.C. Cir. 2011) ("Once we acknowledge that the employees were speaking in metaphor, the [Board's] interpretation is not unreasonable. It is not at all uncommon to speak of verbal sparring, knock-down arguments, shots below the belt, taking the gloves off, or to use other pugilistic argot without meaning actual fisticuffs. What these words stand for, of course, is a matter of context.").

As such, we uphold the Board's determination that Craft was improperly dismissed for engaging in expression protected by the Act, and that Caterpillar must reinstate him.

### III. Conclusion

For the foregoing reasons, Caterpillar's petition for review is **DENIED**, and the Board's cross-application for full enforcement of its order is **GRANTED**.