RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

*v.*

METRO MAN IV, LLC, dba Fountain Bleu Health and
Rehabilitation Center, Inc.,

*Respondent*.

No. 23-1472

───────────────

On Application for Enforcement
of an Order of the National Labor Relations Board.
No. 07-CA-264407

Argued: May 9, 2024

Decided and Filed: August 29, 2024

Before: BUSH, NALBANDIAN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Heather S. Beard, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Grant T. Pecor, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Respondent. **ON BRIEF:** Heather S. Beard, Ruth E. Burdick, Usha Dheenan, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Grant T. Pecor, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Respondent.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. When the COVID-19 virus struck a nursing home in March 2020, the owner, Metro Man IV, LLC, facing staff shortages, took emergency measures

to keep its residents safe.  Namely, it implemented temporary hazard pay and hired non-certified nursing aides.  The National Labor Relations Board determined that the exigent circumstances presented by COVID excused Metro Man from its initial obligations to bargain with SEIU Healthcare Michigan (the Union).  However, the Board determined that Metro Man failed to bargain with the Union regarding the effects of its unilateral decisions and the decisions themselves when the emergency receded.  For the reasons that follow, we grant in part and deny in part the Board's petition to enforce its order.

## I.

Metro Man bought a 108-bed nursing home in Livonia, Michigan in October 2018. *Metro Man*, 372 NLRB No. 37, at *1–2.  The company from whom Metro Man purchased the facility recognized the Union as the bargaining representative for two groups of employees: Licensed Practical Nurses (LPNs, in the LPN unit), and support staff, including regular and part-time Certified Nursing Assistants (CNAs, in the service unit).  *Id.*  Metro Man voluntarily recognized the Union and notified it that the majority of these employees accepted Metro Man's offer of employment.  *Id.*

The events giving rise to this litigation began in late March 2020, when nursing home residents started to contract COVID.  Approximately 75% of Metro Man's unionized staff, including nurses, stopped coming to work.  1st Admin. Rec., R. 12, PageID 550.  The Union emailed Metro Man two bargaining proposals, on March 29 and April 6, to address work conditions during the pandemic.  *Metro Man*, 372 NLRB No. 37, at *2.  These proposals dealt with hazard and overtime pay, the provision of personal protective equipment, and virus testing. *Id.*

Metro Man did not reply to the proposals but implemented other changes to address the staffing shortages.  *Id.*  During a staff meeting in early April, nursing home Chief Operating Officer, Charles Dunn, announced a $2-per-hour pay increase for all staff that became effective on April 8.  *Id.*  Dunn told employees the raise would stay in effect as long as the nursing home was treating COVID patients.  *Id.*  The company posted a notice by the time clock stating that employees would "be receiving a $2.00 dollar an hour increase for all hours worked," which

would "remain in effect until further notice."  Appendix, R. 18, PageID 1217.  Next to that notice, the nursing home posted the number of COVID-positive residents, which it updated daily. *Metro Man*, 372 NLRB No. 37, at *10; 1st Admin. Rec., R. 12, PageID 453–55.  Dunn, as well as the nursing home administrator and director of nursing, testified that they understood the pay increase to be a temporary measure that would end when the nursing home was COVID-free.  1st Admin. Rec., R. 12, PageID 274 (Dunn), 451–52 (administrator), 556–57 (director of nursing).

On April 9, Metro Man took advantage of an emergency federal waiver of nursing assistant licensing requirements to hire non-unit, non-certified nursing aides to do work typically performed by unit CNAs.  *Metro Man*, 372 NLRB No. 37, at *3.  All worked part-time.  By the time the last non-certified aide was discharged on November 2, Metro Man had hired 28 of them. *Id.*  Metro Man did not notify the Union of either the hazard pay or its decision to hire non-certified nursing aides.  *Id.*

On June 10, Metro Man and the Union had a contract bargaining meeting, their first since COVID began.  *Id.*  The Union again presented proposals addressing pandemic-related issues like hazard pay and staffing.  *Id.*  The next day, June 11, was the last day that any facility residents tested positive for COVID-19.  *Id.*  Metro Man then suspended the wage increase at the end of the pay period, on June 16.  *Id.*

Almost two more months passed before the Union learned about the temporary pay increase and hiring of non-certified nursing aides.  The Union found out on August 4, when the parties held another bargaining session.  Nursing home employees told a Union representative about the pay increase (and its later rescission) and the representative learned about the non-certified nursing aides from an employee roster.  *Id.*

On August 6, the Union filed an unfair labor practice charge with the Board.  The Board's General Counsel filed a complaint alleging that Metro Man violated §§ 8(a)(5) and (1) of the National Labor Relations Act (the Act), codified at 29 U.S.C. §§ 158(a)(5) and (1), by failing to bargain with the Union before increasing unit employees' wages by $2 per hour, using non-unit employees to perform unit work, and reducing unit employees' wages when it rescinded

the $2-per-hour pay increase.  *Id.* at *2.  The Board asked that Metro Man be made to rescind those unilateral changes.

An administrative law judge determined that Metro Man violated §§ 8(a)(5) and (1) of the Act when it unilaterally increased, then decreased, unit employees' wages and hired temporary employees to perform unit work "without first affording notice and a meaningful opportunity to bargain to the union representing the employees." 1st Admin. Rec., R. 12, PageID 1436–37.  Although Metro Man claimed that exigent circumstances excused its obligation to bargain with the Union, the ALJ concluded that the company could still have notified the Union of the changes.  *Id.*  The ALJ ordered Metro Man to pay unit employees back pay for the rescinded wage increase, with interest.  *Id.* at PageID 1443–45.  He did not require Metro Man to reinstate the wage increase moving forward.  *Id.* at PageID 1444.

Metro Man, the Board's General Counsel, and the Union filed exceptions to the ALJ's decision with the Board.  The Board amended the ALJ's Order, determining that the exigencies posed by the pandemic excused Metro Man from its initial bargaining obligations: with up to 75% of nursing home employees failing to report to work, and COVID sweeping through the facility, the unilateral changes were necessary for the safety of the residents.  *Metro Man*, 372 NLRB No. 37, at *4.  However, the Board agreed that Metro Man violated the Act when it failed to notify the Union of the changes and offer it an immediate opportunity to bargain over the unilateral decisions.  *Id.* at *5.  It also affirmed that Metro Man's decision to rescind the wage increase without notifying or bargaining with the Union—which it viewed as a decision distinct from implementing the hazard pay—was unlawful because the reasons for the initial pay bump were no longer present.  *Id.*  The Board ordered Metro Man to rescind the wage reduction for unit employees (and reinstate the $2-per-hour pay increase).  *Id.*  It further required Metro Man to bargain with and notify the Union before implementing any future changes in pay, hours, or other terms of employment.  *Id.*  Finally, the Board altered the remedy to include not just lost earnings and benefits, but also any other direct or foreseeable pecuniary harms suffered as a result of Metro Man's unlawful acts.  *Id*. at *7.

One Board member dissented in part.  He agreed that exigent circumstances excused Metro Man's decisional-bargaining obligations.  But he disagreed on two fronts.  First, he

viewed the implementation and rescission of the $2-per-hour wage increase as one decision because Metro Man was clear when it raised wages in April that the pay bump would expire when the nursing home was COVID-free.  *Id.* at \*10.  Therefore, Metro Man's June rescission of the hazard pay was not a new decision, subject to new bargaining obligations, but the conclusion of its initial decision.  *Id.*  Second, because exigent circumstances excuse a company's decisional-bargaining obligations, the dissenting Board member disagreed that Metro Man was required to bargain about its decisions after the exigent circumstances ended.  Instead, he thought Metro Man should have been made to bargain about the *effects* of its decision to hire non-certified nursing aides, but not its temporary decision to increase wages.  *Id.* at \*13–14.

The Board now petitions this court for enforcement of its Order pursuant to Section 10(e) of the Act, codified at 29 U.S.C. § 160(e).

**II.**

Our "review of the Board's decision is quite limited."  *Bannum Place of Saginaw, LLC v. NLRB*, 41 F.4th 518, 523 (6th Cir. 2022) (quoting *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016)).  We review the Board's factual determinations "under a substantial evidence standard," meaning that we will affirm its determinations if the record as a whole "provides sufficient evidence for a reasonable fact finder" to reach the same conclusions. *Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002) (internal quotations and citations omitted).

We review the Board's conclusions of law de novo.  *Caterpillar Logistics*, 835 F.3d at 542.  Still, we will not "'rubber-stamp' Board decisions that controvert the NLRA," and must "carefully scrutinize accusations that the Board failed to abide by precedent."  *Kellogg Co. v. NLRB*, 840 F.3d 322, 327 (6th Cir. 2016) (quoting *Vokas Provision Co. v. NLRB*, 796 F.2d 864, 869 (6th Cir. 1986)).  We must "set aside Board decisions which rest on an erroneous legal foundation."  *E. Tenn. Baptist Hosp. v. NLRB*, 6 F.3d 1139, 1143 (6th Cir. 1993) (internal quotations and citation omitted).

## III.

### A.  Wage Increase

We first address a factual dispute: whether Metro Man's implementation and later rescission of the $2-per-hour pay increase constituted a single or separate decisions.  We must consider whether the record presents sufficient evidence to support the Board's determination that the decisions were distinct.  *Dupont Dow Elastomers*, 296 F.3d at 500.  It does not.

The Board determined that Metro Man "reserved for itself the discretion to determine when to end the wage increase" and made an "independent decision" in rolling back the increase. *Metro Man IV, LLC*, 372 NLRB No. 37, at *6.  But the Board has not identified substantial evidence for that conclusion.  When Dunn announced the wage increase, he specifically stated that it would last only as long as there was COVID in the facility.  He, the nursing home administrator, and the director of nursing all understood the hazard pay to be a temporary measure that would expire when the facility was COVID-free.  In fact, the administrator felt that a flyer posted on June 12 announcing that the nursing home was COVID-free also constituted notice that the pay increase would conclude.  Appendix, R. 18, PageID 458.  It is true that Metro Man posted a flyer by the time clock stating that the raise would last "until further notice."  *Id.* at PageID 1217.  But it would have been impossible for the employer to provide the exact date that the nursing home would be COVID-free.  The testimony supports only the finding that "until further notice" meant the time that the home treated its last COVID patient.  This is bolstered by the fact that Metro Man posted a daily count of COVID-positive residents next to that notice. Dunn made no further announcements or decisions, and Metro Man suspended the pay increase promptly after the nursing home became COVID-free.

On the whole, sufficient evidence does not support the Board's conclusion that Metro Man's termination of the pay increase was a decision distinct from the one to implement the pay increase.  The rescission of the $2-per-hour pay increase was therefore not subject to its own bargaining requirements.  And, as explained below, COVID excused Metro Man's obligation to bargain with the Union regarding the implementation of the temporary pay raise.  Metro Man therefore did not commit an unfair labor practice when it introduced the hazard pay without first

bargaining with the Union, including the term that it would expire when the nursing home treated its last COVID patient.

## B. Post-implementation Bargaining Obligations

Neither party disputes the Board's determination that COVID presented exigent circumstances excusing Metro Man's obligation to bargain with the Union before implementing the $2-per-hour pay bump and hiring non-unit, non-certified nursing aides.  They disagree instead on the scope of Metro Man's bargaining obligations after the need for immediate decision making passed.  The Board believes that Metro Man was obligated to bargain with the Union regarding both the effects of its unilateral decisions and the decisions themselves.[1]  Metro Man, on the other hand, thinks that the exigent circumstances excused its decisional-bargaining obligations entirely.  The employer concedes that it was obligated to engage in effects-bargaining regarding its decision to hire non-certified nursing aides—and insists that it did so—but argues that it was not required to do the same regarding its decision to implement a temporary pay increase.  To the extent that it was required to engage in effects-bargaining regarding the pay increase, Metro Man says that it did so.

### i. Decisional-bargaining obligations

Under Section 8(a) of the Act, an employer must "bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5).  Employers and unions are required to "confer in good faith with respect to wages, hours, and other terms and conditions of employment."  *Id.* § 158(d).  Therefore, if an employer unilaterally alters certain terms of employment without bargaining, it violates § 8(a)(5).  *Id.* § 158(a)(5).  There is an exception,

---

[1]The Board argues that this court lacks jurisdiction under 29 U.S.C. § 160(e), § 10 of the Act, to hear Metro Man's argument that exigent circumstances excused its decisional-bargaining obligations entirely because Metro Man failed it before the Board.  That is incorrect.  First, in its exceptions to the ALJ's decision, Metro Man objected to the ALJ's determination that exigent circumstances did not excuse it from its notification and bargaining obligations regarding its unilateral decisions.  1st Admin. Rec., R. 12, PageID 1455–56.  It raised a similar point in its Response to the General Counsel's Reply Brief to its Exceptions.  *See id.* at PageID 1612 ("[T]he ALJ should have focused on whether the exigent circumstances present privileged the Employer to implement the temporary changes at issue in this dispute.").  Second, Metro Man does not ask this court to "consider a separate issue that was never urged upon the Board."  *NLRB v. U.S. Postal Serv.*, 833 F.2d 1195, 1202 (6th Cir. 1987).  Rather, it asks it to review whether it was required to notify and bargain with the Union regarding its unilateral actions, "a ruling that was vigorously disputed by the parties before the Board."  *Id.*

however, where exigent economic circumstances justify immediate action. *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 755 (6th Cir. 2003). If an employer can prove that an "unforeseen occurrence, having a major economic effect . . . requires the company to take immediate action," then it may make unilateral changes without first bargaining with the union. *Id.* at 756 (quoting *Angelica Healthcare Servs.*, 284 NLRB 844, 853 (1987)); *see also RBE Elecs. of S.D., Inc.*, 320 NLRB 80, 81 (1995) (explaining that "certain compelling economic considerations . . . excus[e] bargaining entirely about certain matters").

The exigent circumstances posed by COVID excused entirely Metro Man's decisional-bargaining obligations about the hazard pay and hiring of non-licensed CNAs. *See RBE Elecs.*, 320 NLRB at 82. Metro Man was not required to bargain with the Union "about both the effects of its decisions and about the decisions themselves." *Metro Man IV*, 372 NLRB No. 37, at *4.

The Board relied on two of its previous decisions to conclude otherwise, but they are readily distinguished. In the first case, an employer laid off its employees without bargaining with their union after Hurricane Rita caused a citywide evacuation order, which "necessitat[ed] the closure of [the employer's] facility." *Seaport Printing & Ad Specialties, Inc.*, 351 NLRB 1269, 1269 (2007). When the employer returned to its facility, it hired some non-bargaining unit workers to perform bargaining work. *Id.* The Board determined that the facility shutdown constituted an economic exigency excusing the employer from its obligation to bargain with the union before laying off employees. *Id.* at 1270. However, the employer was not excused from its decisional-bargaining obligations before hiring non-union workers. *Id.*

In the second case, the employer subcontracted a non-unit party to repair a computer server after its sole information technology employee, a member of the bargaining unit, resigned. *Kankakee Cnty. Training Ctr. for the Disabled Inc*, 366 NLRB No. 181, at *1 (Aug. 27, 2018). Months later, when the server crashed again, the employer hired another non-unit party to fix it. *Id.* The Board determined that economic exigency excused the employer's duty to bargain with the union before hiring the first subcontractor but did not excuse its duties before hiring the second. *Id.* at *1–2.

In neither case did the Board require the employers to engage in bargaining with the unions regarding the decisions made during the exigent circumstances. The Board's conclusion that Metro Man was required to engage in decisional bargaining after those obligations were excused by exigent circumstances is therefore erroneous. *See E. Tenn. Baptist Hosp.*, 6 F.3d at 1143.

### ii. Effects-bargaining obligations

Even if an employer's decisional-bargaining obligations are excused, it may be required to bargain with the Union over the *effects* of its unilateral decisions if they involve "pay, wages, hours of employment, or other conditions of employment." *First Nat. Maint. Corp. v. NLRB*, 452 U.S. 666, 675 n.12, 681–82 (1981) (quoting 29 U.S.C. § 159(a)); *see* 29 U.S.C. § 158(a)(5). This includes unilateral decisions about layoffs, *Seaport Printing*, 351 NLRB at 1270, or plant closures, *Dodge of Naperville, Inc. & Burke Auto. Grp., Inc.*, 357 NLRB 2252, 2253–54 (2012). Effects-bargaining "must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy." *First Nat. Maint. Corp.*, 452 U.S. at 682.

We first consider Metro Man's effects-bargaining obligations as to its decision to hire non-certified nursing aides. As explained above, the parties agree that Metro Man was required to bargain over the effects of its decision to hire non-certified nursing aides. But they disagree over whether Metro Man fulfilled that obligation.[2] The evidence supports the Board's position. First, Metro Man never directly notified the Union of its decision to hire non-certified nursing aides, even though the parties were in email communication and had an in-person bargaining meeting on June 10. Instead, the Union discovered the change after reviewing an employee roster on August 4. Second, although Metro Man argues that it negotiated with the Union over the "topics involved," it was not negotiating about the effects of the actual changes it made. Metro Man Br. at 37. It was instead responding to Union proposals regarding COVID work

---

[2]The Board again insists that we lack jurisdiction to hear Metro Man's argument that it satisfied its effects-bargaining obligations under § 10 of the Act. 29 U.S.C. § 160(e). But, again, the general issue of whether Metro Man met its post-implementation obligations was squarely before the Board. Moreover, Metro Man and the General Counsel asserted arguments before the ALJ and in their administrative appeals regarding whether Metro Man had (and met) its obligation to bargain about the effects of its decisions. That included whether Metro Man failed to engage in effects bargaining. *See* 1st Admin. Rec., R. 12, PageID 1090, 1097, 1613.

conditions.  Any proposals Metro Man put forth regarding these issues after its August 4 meeting with the Union dealt with future policies, not the changes it had already implemented.

We must also consider Metro Man's effects-bargaining obligation regarding its decision to temporarily implement hazard pay.  By the time the Union found out about the hazard pay, the nursing home was already COVID-free, and the pay bump had expired.  And, as explained above, Metro Man was excused from its decisional-bargaining obligations when it implemented the pay raise and had none when it rescinded it because those actions constituted one decision.  Bargaining about the effects of an already expired pay raise could therefore not "be conducted in a meaningful manner and at a meaningful time," because nothing remained to bargain about.  *See First Nat. Maint. Corp.*, 452 U.S. at 681–82.  Accordingly, Metro Man did not commit an unfair labor practice when it failed to bargain with the Union regarding the effects of the temporary pay raise.

**IV**

For the foregoing reasons, we **AFFIRM** the NLRB's conclusion with respect to Metro Man's failure to engage in effects-bargaining regarding its decision to hire non-unit, non-certified nursing aides.  We **REVERSE** the NLRB's conclusions with respect to Metro Man's alleged failure to engage in effects-bargaining regarding the implementation of the $2-per-hour pay raise and decisional-bargaining regarding its rescission.  Therefore, the NLRB's petition for enforcement is **GRANTED IN PART AND DENIED IN PART**.  The matter is **REMANDED** to the NLRB for further proceedings and orders not inconsistent with this opinion.